505 So.2d 211 (1987)
STATE of Louisiana
v.
Jack R. OBNEY, Jr.
No. CR86-424.
Court of Appeal of Louisiana, Third Circuit.
April 8, 1987.
Writ Denied July 1, 1987.
*212 David Beach, M. Michelle Fournet, Jean M. Faria, Baton Rouge, for defendant-appellant.
Michael R. Erwin, Asst. Atty. Gen., Baton Rouge, Richard Ieyoub, Dist. Atty., Saundra Isaac, Asst. Dist. Atty., Lake Charles, for plaintiff-appellee.
Before DOMENGEAUX, GUIDRY and STOKER, JJ.
DOMENGEAUX, Judge.
Jack R. Obney, Jr., was indicted by an East Baton Rouge Parish Grand Jury on March 12, 1985 for violating La.R.S. 14:30.1, second degree murder. He was tried on March 6, 1986 in the Fourteenth Judicial District Court. The trial, pursuant to a defense motion for a change of venue, had been transferred from East Baton Rouge Parish to Calcasieu Parish.
A jury of twelve, by a vote of 10 to 2, found the defendant guilty of second degree murder. The defendant was sentenced in accordance with the only penalty provided, life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.
On appeal, the defendant has assigned eleven errors. Only three of the assignments are addressed in this decision. The remaining assignments, because this case was decided without oral argument and because they were not briefed by the defendant, are considered to have been abandoned. State v. Dewey, 408 So.2d 1255 (La.1982), and State v. Blanton, 325 So.2d 586 (La.1976).

FACTS
On March 2, 1985, at 2 P.M., three-year-old Joshua Allen Gnagie was admitted into the emergency room of Earl K. Long Hospital in Baton Rouge. Joshua was experiencing severe stomach cramps and his abdomen *213 was distended, large and tight. He died at 12:05 A.M. the following day.
Dr. Arthur Triboa, one of Joshua's attending physicians, and Dr. Alfredo Suarez, the pathologist who performed the autopsy on Joshua's body, both determined that the child died of acute peritonitis.[1] Doctor Triboa testified that the peritonitis resulted from "... some disruption in the intestinal tract."[2] Doctor Suarez attested that the peritonitis was "... due to a rupture of the small bowel, the duodenum...."[3] The testimony of both doctors indicated that "acute" meant, in a temporal sense, a relatively short period of time, hours or days. The doctors contrasted acute with "chronic", which they stated referred to a much longer period of time, days or weeks.
Doctor Suarez testified, relying on his many years experience,[4] that Joshua's duodenum ruptured as the result of something having been violently thrown against his abdomen or from someone hitting, kicking or stomping on his abdomen. Doctor Suarez stated, based upon the purple-red color of the hemorrhage he observed surrounding the tear, that Joshua probably received the trauma from which he died in the twenty-four hours immediately preceding his death.
Doctor Suarez explained that the trauma Joshua received to his abdomen caused his internal organs to bunch together against his spine. The organs, the doctor testified, absorbed the impact of the trauma because the spine acted as a base and repelled the pressure. In this instance, Doctor Suarez stated, the pressure exerted on the duodenum by the other organs caused it to burst open and spill its contents into the abdominal cavity resulting in peritonitis. Doctor Suarez was firmly convinced that the conditions he observed during the autopsy were not consistent with the conditions he would have observed had Joshua suffered from peritonitis for several days.
The defendant's medical expert, Dr. Charles S. Petty, testified that the injury from which Joshua died was not of recent origin. Doctor Petty stated that if any force was exerted on Joshua's abdomen that force only excerbated Joshua's prior injuries. The doctor was firm in his belief that if Joshua had not received medical attention for his previous injuries he would have eventually died from those injuries. He was also convinced that any force brought to bear on Joshua's abdomen only hastened his demise.
On the evening of March 1, 1983, at about 8:30, Mrs. Cathy Griffith, Joshua's twenty-two-year-old mother, left for work as a waitress in an all-night restaurant. She left Joshua in the care of her live-in boyfriend, the defendant, forty-two-year-old Jack Obney.
When Griffith returned home from work, about seven o'clock the next morning, March 2, Obney told her that Joshua had awakened in the middle of the night, about 1:00 or 1:30, and he thought the child had fallen in the bathroom. Griffith went to her son's bed. She found Joshua's lip busted and a bruise on the right side of his head near the hairline. Joshua was not feeling well, was very quiet and did not want to get out of bed.
Joshua's health deteroriated as the day progressed. By noontime, his abdomen was quite swollen. Shortly thereafter, when Joshua arrived at the hospital, Doctor Triboa described his appearance as looking like he had swallowed a basketball. Prior to his being brought to the hospital, Joshua was lying down and did not get up.
Griffith stated that she wanted to bring Joshua to the hospital as early as 8:30 or 9:00 o'clock on the morning of March. She explained that she was unable to do so because Obney had used their car that morning to go to work. Griffith further stated that she telephoned Obney at work on three occasions before noon and that *214 each time he told her he would be leaving for home shortly. Obney declared that he told Griffith to call him if she thought Joshua needed to go to the hospital. He stated that she did call him once, but since she did not call him a second time he assumed that Joshua was well.
Joshua was eventually brought to the hospital where he arrived about 2 P.M. Unfortunately for the three year old, by the time he arrived it was already too late. His condition had reached the point beyond which the doctors could save his life. Joshua Allen Gnagie died at 12:05 A.M., Sunday, March 3, 1985.
On the night of Joshua's death, Detective Dana Smith of the Baton Rouge City Police Department was on duty. When the staff of Earl K. Long Hospital contacted the police department to report Joshua's death as having occurred under unusual circumstances, Officer Smith, an investigator in the juvenile and sex crimes division, was dispatched to the hospital. Smith interviewed the emergency room physicians and then returned to the police station where she completed her report in the early morning hours.
Upon the arrival of the morning shift, Smith enlisted the assistance of Detectives Robert N. Howle, Majorie Groht, and R.E. Thompson. Smith informed Howle, Groht, and Thompson of the status of the case and requested that they go to the home of Griffith and Obney to further investigate the circumstances surrounding Joshua's death.
The officers, dressed in street clothes and driving unmarked cars, arrived at the Griffith and Obney residence at about 8 A.M. The defendant answered their knock. The officers identified themselves, informed Obney of their investigation and stated that they were at his home to request formal statements from both he and Griffith.
Griffith was asleep in the rear bedroom when the officers arrived. Obney woke her and told her that the police were at their home. When she entered the front of the apartment, the officers informed her that they were investigating the death of her son.
Obney and Griffith were both, at this point, informed of their constitutional rights. The officers testified that this step was taken, not because either was being arrested, but only because they were being questioned regarding a possible homicide. Obney and Griffith denied being read their rights.
After informing Obney and Griffith of their rights, the officers requested that they accompany them to the police station to facilitate their giving formal statements. Obney rode with Howle and Thompson, and Griffith traveled with Groht. Obney and Griffith were separated, the officers testified, because as the persons most responsible for Joshua's care they would be suspects should any illegality be discovered and the officers chose to eliminate any opportunity for collusion. Despite contrary testimony by the defendant, the officers emphatically testified that both Obney and Griffith voluntarily went to the police station to assist in the investigation.
The officers returned to the station house less than forty-five minutes after they had first arrived at the Griffith and Obney residence. Obney was brought to a second floor interview room where he waited until the officers were prepared to take his statement.
Obney testified that the door to the interview room was locked from the outside and that had he attempted to leave he would have been prevented from doing so. The officers flatly disputed Obney's account stating that he voluntarily waited to give his statement. The officers further testified that during Obney's wait he was offered coffee and cigarettes, which the officers brought periodically, and was even told where he could find the coffee pot if none of the officers were available.
The first official interrogation of Obney took place at 11:49 A.M. The defendant, prior to the first question being asked, was again read his rights. He stated that he understood them and wanted to cooperate with the officers. Obney then executed a "Rights Of Arrestee or Suspect" form.
*215 During this interrogation, the officers, having just received the autopsy results, informed Obney of Doctor Suarez's conclusions. Prior to concluding the interrogation, Obney was asked if he would make a formal recorded statement. According to the testimony of the attending officers, Obney willingly agreed to make the statement.
Obney's formal recorded statement was taken at 2:17 P.M. Present for the statement was Detectives R.E. Thompson and Majorie Groht. Prior to any questioning, the defendant was read his rights for a third time. He again stated that he understood them.
During the statement Obney related the events of the night of March 1 and the morning of March 2, 1985. Obney stated that Joshua went to bed about 10 P.M. or shortly thereafter. Obney told the officers that he went to bed a short time after Joshua. He further stated that he was awakened about 1:00 or 1:30 A.M. by Joshua, whom he said was in the living room crying or whining.
Obney asked the boy if he needed to go to the bathroom, to which Joshua replied that he did not. At this point, Obney, who said that Joshua "... gets a little stubborn every once in a while.",[5] instructed the child to go to the bathroom "... anyhow...."[6] After he told Joshua to go to the bathroom, Obney returned to his bed.
Joshua did not, however, stop whimpering. When Joshua's whining disturbed Obney for the second time, Obney got up and again went into the living room. Joshua was on a bed that his mother had made for him on the living room floor. The defendant went over to him and told him to "... hush up...."[7] When Joshua, still whimpering, began to get up, Obney told him to "... lay down ..."[8] and stomped his foot on the child's abdomen to force Joshua back down.
Although Obney stated that "... he didn't really even jam it down on [Joshua]...", he did state that "... I can't even lie about it, I heard like air go `whoosh' like that there...."[9] After being kicked in the abdomen, Joshua did not get up.
Obney concluded his statement by telling the officers "[t]hanks for not treating me like a criminal."[10] Obney was then arrested for the murder of Joshua Gnagie.

ASSIGNMENT OF ERROR NO. 1
The defendant asserts in this initial assignment of error that the trial judge erroneously permitted the prosecution to introduce his statement of March 3, 1985, into evidence. The defendant argues that when the police first arrived at his home at eight o'clock he was arrested. He contends that because the officers possessed neither probable cause nor an arrest warrant he was arrested in violation of his rights under the United States and Louisiana Constitutions. He ultimately declares that the statement he gave should be suppressed as the fruit of an unlawful arrest.
We do not believe that the defendant was under arrest when he gave the police his statement. We further believe that the statement was free and voluntary, and that it was not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. La. R.S. 15:451 (1981). The trial judge correctly denied defendant's motion to suppress. This assignment has no merit.
"Arrest" is defined by La.Code Crim. Proc. art. 201 (1966) as,
... [t]he taking of one person into custody by another. To constitute arrest there must be an actual restraint of the person. The restraint may be imposed by force or may result from the submission of the person arrested to the custody of the one arresting him.
*216 The definition is premised upon the concept of restraint. The trial court is obligated to review all of the circumstances and determine subsequently if the liberty of the accused was restrained either physically or through a show of authority.
Whether an individual is by law considered to have been placed under arrest does not depend solely on the time the accused is informed "you are under arrest." Ultimately, a person may be considered to have been arrested or "seized" when "... in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980), reh'g denied, 448 U.S. 908, 100 S.Ct. 3051, 65 L.Ed.2d 1138 (1980), See also, State v. Tomasetti, 381 So.2d 420 (La.1980), and State v. Morvant, 384 So.2d 765 (La.1980).
The Louisiana Supreme Court in State v. Thibodeaux, 414 So.2d 366, 368 (La.1982) held that "[w]hether a person has been taken into custody, detained or deprived of his freedom in any significant way must be decided by an objective test." The Court further stated that neither a defendant's subjective impression nor the formality of an official arrest should be considered determinative. Based upon a thorough review of the totality of facts, Jack R. Obney, Jr., had yet to be arrested at the time he gave his statement.
When the officers arrived at Obney's residence that Sunday morning they were dressed in street clothes and driving unmarked cars. They did not intrude into the sanctity of the defendant's home, but rather, knocked and were invited in. No guns were drawn, no handcuffs were displayed and no threatening statements or actions were made. The defendant voluntarily accompanied the police to the stationhouse. The defendant, whether sincere or not, fostered the belief that he desired to assist the officers' investigation. See, State v. Statum, 390 So.2d 886 (La.1980).
Obney argues that, because he was never explicitly informed that he did not have to accompany the officers or give a formal statement, his statement should be suppressed. Although he was never expressly told that he did not have to accompany the officers or make a statement, he was read his rights, a fact he denies, and informed of his right to remain silent.
The officers testified that they expressly requested Obney's "voluntary" cooperation. Their testimony indicated that they emphasized the fact that the defendant's voluntarily assistance was necessary to the investigation and that his statement could not otherwise be taken. The defendant produced no evidence from which we could conclude that his actions were anything less than willing.
The defendant relies heavily on State v. Menne, 380 So.2d 14 (La.1980), to support the proposition that, because he was not advised he did not have to accompany the officers or give a statement, his statement was obtained in violation of his rights. The defendant's reliance is misplaced.
The defendant in Menne was a suspect in a murder investigation. He was originally questioned by the police two months prior to the interrogation at issue. During the initial interrogation, Menne denied any complicity in the murder.
The police, during the interim from their initial questioning until the second interrogation, learned that the murder weapon had once been owned by Menne. Upon this discovery, the defendant was telephoned and asked to return to the police station for additional questioning about the weapon. The defendant agreed and a squad car brought the defendant to the stationhouse. Menne was never advised of his constitutional rights. He was never informed that he was not under arrest nor was he ever told that he was not obligated to remain or answer the officers' questions.
Two additional and significant factors, which distinguish Menne from the instant case, are also present. The officers conducting the investigation informed Menne that they believed he knew more than he was telling them. They also told the defendant they no longer believed his previous story because he was the last person *217 known to possess the murder weapon. The officers' statements, the court concluded, were unmistakably coercive and it would have been "... rash indeed to suppose that he was free to leave ... if he pleased." Id. at 17. No such subtle coercion was evident during Obney's interrogation.
Obney also testified that he wanted to use his own automobile to drive to the police station but, the officers refused to allow it. This accusation of the defendant is not supported by the evidence. The statement does, however, reflect a willingness to appear at the police station and cooperate with the investigation, a willingness the officers testified Obney demonstrated.
Obney charges that he was locked in an investigation room when he arrived at the police station and would have been refused permission to leave had he so desired. The testimony of the police officers counters that of Obney.
The officers testified that the investigation room in which Obney waited was never locked and that he was free to leave any time he chose. Supporting the officers' accounts of the events is the fact that Griffith, Joshua's mother, waited at the officers' request in the reception/waiting area in the first floor lobby of the police station. Logic suggests, with the minimal evidence which the officers possessed when they arrived at the Obney and Griffith residence that both Obney and Griffith would have been treated similarily. There was no reason for the officers to believe that Obney knew more or was more involved in Joshua's death than Griffith.
Obney testified at the hearing on the motion to suppress that he requested and was denied permission to telephone his mother. He stated that he wanted to call her so he could tell her where he was and so she could bring him cigarettes. Officer Thompson, from whom Obney alleges he sought permission, rebutted Obney's statement. Thompson testified that Obney never requested to use the telephone.
The defendant's allegations upon review are, at the least, suspicious. Obney, at the time of the murder of Joshua Gnagie, was a forty-two-year-old man who did not reside with his mother. His testimony that he wanted to tell his mother where he was and have her bring him cigarettes gives pause for doubt.
Obney additionally alleges that Detective Thompson induced him into giving his statement on the promise that he would only be charged with manslaughter. Officer Thompson, a police veteran with eleven years service, eight of those as a detective, stated that he made no such promise to Obney. He explicitly testified that he knew such activity was prohibited.
Obney was asked, in the recorded statement which he is now attempting to suppress, if he was forced or coercised to make the statement, or promised anything in return. He, on each occasion, replied, "No."
Griffith's testimony at the suppression hearing, although she testified for the defense, negates Obney's account of the events. Griffith was asked whether she was enticed to make her statement by promises that she would not be arrested or that she would be charged with a lesser offense. Her response was "I had no idea of being arrested."[11] When she was asked "[S]o when you told them what happened you told them of your own accord?", she replied, "I was answering their questions. I thought I was giving my formal statement and I was leaving."[12]
The evidence does not indicate that Obney was in any manner proded or coerced into traveling to the police station or giving his statement. The police officers, under very intense and thorough cross examination testified that they were well acquainted with the constitutional rights accorded members of our society and that Obney's rights were zealously protected.
Obney was not in custody, nor detained, nor was his liberty restrained in any significant way prior to the time he gave his *218 formal statement. He acted without outside influence in the manner he forsaw to be in his best interest.

ASSIGNMENT OF ERROR NO. 2
The defendant, at the conclusion of the evidentiary stage of the trial, requested pursuant to La.Code Crim.Proc. art. 807 (1966) that the jury be given three special charges. The court reviewed each charge, instructed the jury as to two but, declined to charge the jury according to the third. The defense contends that the trial judge erred. We believe that the issue was correctly resolved and hold that this assignment of error has no merit.
Article 807 states, in pertinent part,
A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given.
A special charge that is wholly correct and pertinent must be given by the court. State v. Arnaud, 412 So.2d 1013 (La.1982). A requested charge that is not supported by the evidence or requires qualification, limitation, or explanation need not be given. State v. Belgard, 410 So.2d 720 (La. 1982), and State v. Smith, 414 So.2d 1237 (La.1982). A special charge that is substantially included in the general charge or in another special charge, although not necessarily verbatim, need not be read to the jury. State v. Gipson, 359 So.2d 87 (La. 1978), and State v. Simmons, 422 So.2d 138 (La.1982).
The defense, prior to closing arguments, requested that the jury be instructed according to the following charge:
If the evidence shows that someone other than the accused committed the offense charged it is the duty of the jury to acquit; or if the circumstances which tend to show that some other person may have committed the crime are sufficient to raise a reasonable doubt of the defendant's guilt, an acquittal should follow. State v. Jenkins, [134 La. 185], 63 So. 860 (La.1914).
The trial judge, reasoning that the substance of the special charge was included in the general charge, instructed the jury as follows:
The burden is upon the State to prove the defendant's guilt beyond a reasonable doubt. In considering the evidence, you must give the defendant the benefit of every reasonable doubt arising out of the evidence or out of the lack of evidence. If you are not convinced of the guilt of the defendant beyond reasonable doubt, you must find him not guilty. While the State must prove guilt beyond reasonable doubt, it does not have to prove guilt beyond all possible doubt. Reasonable doubt is doubt based on reason and common sense and is present when, after you have carefully considered all the evidence, you cannot say that you are firmly convinced of the truth of the charge.
The defense contends that the trial judge's failure to instruct the jury pursuant to the requested special charge resulted in confusion and prejudice. The defense argues that because Griffith was indicted for violating La.R.S. 14:93, cruelty to a juvenile, the jury could reasonably conclude that someone other than the defendant caused Joshua's death. The defense also takes the position that the general charge addressing reasonable doubt did not provide a sufficient framework for the jury to evaluate this evidence. This reasoning is flawed.
According to our system of justice, specifically La. Const. Art. I § 16 (1974) and La.Code Crim.Proc. art. 804(A)(1) (1966) (amended 1968), an accused is presumed innocent until proven guilty. The mere fact that Griffith was indicted can create no inference that she in any way mistreated her son or that her conduct resulted in his death.
We agree with the conclusion of the trial judge. The requested special charge was substantially included in the general charge. Additionally, we must state that the requested special charge was not wholly correct and pertinent and would have *219 required qualification. The trial judge was correct in declining to so charge the jury.

ASSIGNMENT OF ERROR NO. 3
During the jury's deliberations, the jury sent the following message to the judge, "Question: May we have a copy of the definitions of 2nd degree murder, manslaughter, and negligent homicide?" The judge responded in writing "I'm sorry, no." and signed his name.
The defense, while in agreement with the trial judge that providing written definitions of the crimes would have been improper, requested that the jury be returned to the courtroom and reread the definitions of second degree murder, manslaughter and negligent homicide. The judge declined the defense request stating that he believed the jury merely desired to have something handy for easy reference and that since they had already been adequately instructed on four separate occasions, during voir dire, opening remarks, closing arguments and in the jury charges, it was unnecessary.
La.Code Crim.Proc. art. 808 (1966) provides,
If the jury or any member thereof, after having retired to deliberate upon the verdict, desires further charges, the officer in charge shall bring the jury into the courtroom, and the court shall in the presence of the defendant, his counsel, and the district attorney, further charge the jury. The further charge may be verbal.
Article 808 mandates that the jury be recharged if the jury or any member thereof requests further charges. Article 808 does not give the defense a right to have the jury reinstructed.
The defense argues, "[t]he defendant's compromise to bring the jury back into the courtroom and reread the Statutes could easily have been done and prevented any confusion on the elements of each offense."[13] The trial court was not, however, obligated to "compromise" the clear dictates of the statutory language.
In State v. Simms, 465 So.2d 769 (La. App.5th Cir.1985), a case similar to the instant case, the jury, during deliberations, requested written copies of the instructions. The trial judge ordered the jury returned to the courtroom and informed them that the law prohibited written instructions from being taken into the jury room, but stated that if there were any specific questions he would address them. No questions were subsequently forwarded to the judge and the jury, thereafter, reached its verdict.
The defense in Simms assigned error contending that the jury should have been reinstructed. The Fifth Circuit upheld the trial judge resting its decision on the authority of State v. Yoxtheimer, 301 So.2d 318 (La.1974), which reiterated the prohibition against providing juries with copies of written charges.
We are in agreement with the Simms court. Although the trial judge in the instant case did not interrupt the jury's deliberations to inform them why he was declining their request, we do not believe he erred.
In conclusion, we must state that we are in agreement with the trial judge regarding the reason the jury desired written copies of the criminal code articles. The message from the jury was not a request to be recharged but, was merely a request to obtain copies of the definitions for their easy reference during deliberations. The trial judge correctly declined their request.
This assignment of error has no merit.
For the above and foregoing reasons the defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] Inflamation of the peritoneum, the serous sac lining the abdominal cavity.
[2] Testimony, Doctor Triboa, p. 575.
[3] Testimony, Doctor Suarez, p. 612.
[4] Doctor Suarez testified that he performed his first autopsy in 1959 and has since performed about 1,500.
[5] Statement, Obney, p. 522.
[6] Statement, Obney, p. 522.
[7] Statement, Obney, p. 524.
[8] Statement, Obney, p. 524.
[9] Statement, Obney, p. 524.
[10] Statement, Obney, p. 528.
[11] Testimony, Hearing on Motion to Suppress, Griffith, p. 413.
[12] Testimony, Hearing on Motion to Suppress, Griffith, p. 413.
[13] Brief of Appellee, p. 16.