580 So.2d 1002 (1991)
STATE of Louisiana, Appellee,
v.
Vernal NUGENT, Appellant.
No. CR 90-959.
Court of Appeal of Louisiana, Third Circuit.
May 22, 1991.
Rehearing Denied June 28, 1991.
*1003 John Brown, Public Defender Office, Lake Charles, for defendant-appellant.
Elaine Solari, Asst. Dist. Atty., Lake Charles, for plaintiff-appellee.
Before FORET, YELVERTON and KNOLL, JJ.
FORET, Judge.
Defendant, Vernal Nugent, was tried and found guilty of the second degree murder of his son, David Nugent, in violation of La.R.S. 14:30.1. Nugent was sentenced to imprisonment at hard labor for life, to be served without benefit of parole, probation, or suspension of sentence. Nugent now appeals his conviction, contending that the evidence does not support a conviction for second degree murder. We agree and find that, under the Jackson v. Virginia standard, the evidence is only sufficient to support a conviction for manslaughter. Therefore, we vacate the verdict of second degree murder, render a judgment of conviction for manslaughter, set aside the sentence, and remand to the district court for resentencing.

FACTS
Between 5:30 and 6:00 P.M. on Sunday, November 5, 1989, Nugent returned home from work, placed a gun, which he always carried, on the dining room table, and sat down at the table to drink a cup of coffee with his wife, Carol. Nugent began telling his wife how, moments earlier, at his son David's camp, he had had an argument with David and also had exchanged words with his brother, Tyler. That same day, David had spent the morning setting up a travel trailer in which he and his wife planned to live. The travel trailer belonged to his father, who had given them permission, reluctantly, to move into his trailer and to use his truck to move the trailer.
Approximately ten minutes later, when David and his friend, Eric Todd Miller, arrived at Nugent's, the defendant informed David that he was not going to allow him and his wife to live in the travel trailer. David became visibly upset, pacing the floor and clenching his fists. The two began to argue, David held his father's head with his hand, and pushed or slapped his father's face several times, spilling hot coffee on Nugent in the process. Then David made a statement to his father that his mother did all the worrying about the bills. Carol, Nugent's wife, got up and put her hand on her husband's chest, in anticipation of trouble, and at the same time told Eric to get David out of the house. David and Eric began to walk toward the door; Carol turned toward the kitchen, saw Nugent pick up the gun, and screamed. Simultaneously, Nugent either said "I'll shoot you, son-of-a-bitch" or told David to "Get the *1004 hell out the house" and the gun went off. The actual physical altercation, from the time David slapped his father until David was shot, took less than two minutes. David died as a result of his gunshot wound.
At trial, Connie Durio testified that she was dispatched by the Lake Charles City Police to the scene. Upon arrival, she observed the victim, still alive, lying on the floor several feet from the doorway. She summoned an ambulance and, after asking what had happened, Nugent responded that he had shot his son. Ms. Durio seized the weapon and gave it to Officer Hoffpauir, who arrived at the scene several moments later. Hoffpauir spoke with Nugent and Nugent stated that he and his son had been arguing, he had picked up the weapon, and it had accidently discharged and shot his son.
Detective Guillory of the Lake Charles Police Department testified that he went with Nugent to the police station. In Nugent's statement, he stated that he and his son were arguing and that his son slapped him in the face. Defendant stated that he told his son to get out and his son came after him again, after which he went to the table and got the gun. Nugent stated that when he turned around with the gun it went off, shooting his son. He stated that he thought the gun was on safety.
Nugent testified at trial that he and David had argued and David stopped at the door before leaving, turned around, and started toward him. Nugent testified that he picked up the gun to scare David and the gun went off, but that Nugent did not know that the safety was off. He also testified that he did not know that the only way he could load the gun was if the safety was off.
Dr. Terry Welke, a pathologist for the Calcasieu Parish Coroner's office, testified that the cause of David's death was a gunshot wound to the neck.
Mr. Tom Harless, of the Southwest Regional Crime Lab, testified that the gun which was recovered at the scene did not malfunction in any way when test fired.

DISCUSSION
Nugent contends that the evidence was insufficient to support his conviction of second degree murder and that, instead, the offense was committed in sudden passion by heat of blood immediately caused by a reasonable provocation. He contends that his son's physical confrontation and the intentional use of words which would anger his father were sufficient to deprive an average person of his self-control and cool reflection.
The Louisiana Supreme Court, in State v. Lombard, 486 So.2d 106 (La.1986), discusses manslaughter as follows, at pages 110 and 111:
"Manslaughter is a homicide which would be either first or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. La.R.S. 14:31(1).8 Thus, the presence of `sudden passion' or `heat of blood' distinguishes manslaughter from murder. The court has stated on several occasions, however, that `sudden passion' and `heat of blood' are not elements of the offense of manslaughter; rather, they are mitigatory factors in the nature of a defense which exhibit a degree of culpability less than that present when the homicide is committed without them. State v. Tompkins, 403 So.2d 644 (La.1981); State v. Temple, 394 So.2d 259 (La.1981); State v. Peterson, 290 So.2d 307 (La.1974).9 Since they are mitigatory factors, a defendant who establishes by a preponderance of the evidence that he acted in a `sudden passion' or `heat of blood' is entitled to a manslaughter verdict.10 Where such proof has been introduced, a second degree murder verdict is inappropriate."[1]
(footnotes omitted)
*1005 The evidence is undisputed that Nugent shot his son. Thus, the issue before us is whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not established by a preponderance of the evidence. See State v. Bryan, 454 So.2d 1297 (La.App. 3 Cir. 1984), writ denied, 458 So.2d 128 (La. 1984).
Manslaughter is a specific intent crime. The culpable state of mind necessary for a manslaughter conviction under Subsection (1) is a specific intent to kill or inflict great bodily harm.
"External circumstances constituting `provocation sufficient to deprive an average person of his self control and cool reflection' may be responsible for generating a specific intent to kill or inflict great bodily harm. That degree of provocation may reduce the homicide to manslaughter if the culpable state of mind arises while the sudden passion is still in effect."

State v. Tompkins, 403 So.2d 644, 648 n. 3 (La.1981).
The jury's determination, either that Nugent did not act in the heat of blood or sudden passion or that Nugent's blood had cooled or that an average person's blood would have cooled, is clearly contrary to the evidence. Nugent's son, David, had been drinking at the time of the confrontation. Both Nugent and his son were angry. David was angry because his father had just told him he could not live in his parents' travel trailer after he had just spent a portion of the day moving it and setting it up as a residence.
Nugent was angry for reasons of his own, among those being David's slapping his face several times, spilling coffee on him, and David's comments to the effect that he went his own way and left his wife to worry about the bills. This last remark of David's to his father triggered Nugent's response even further. His wife knew there was trouble brewing as she put her hand on Nugent's chest and told David's friend, Eric, to get David out of the house.
Most unfortunately, there was a loaded pistol within easy reach of Nugent. In his rage, Nugent reached for his pistol rather than throwing the nearest object or using his fists to hit his son. This reactionary move resulted in his son's death. Clearly, Nugent was deprived of his power of self control and cool reflection during this altercation. There is no evidence that Nugent's blood had cooled or that an average person's blood would have cooled in this time span. We find that no rational trier of fact could have concluded other than that Nugent shot his son in a fit of rage.
We find, by a preponderance of the evidence, that Nugent committed the offense in a sudden passion or heat of blood caused by a provocation which would have deprived an average person of his self control and cool reflection. Thus, the jury was in error when it found Nugent guilty of second degree murder rather than returning a verdict of manslaughter.
In reviewing the record, we also note that after approximately thirty-five minutes of deliberation, the jury asked for "a copy (text) of the difference between second degree murder and manslaughter" to which the judge responded in writing "No, I'm sorry I cannot" and signed his name.
La.C.Cr.P. art. 808 provides, as follows:
"If the jury or any member thereof, after having retired to deliberate upon the verdict, desires further charges, the officer in charge shall bring the jury into the courtroom, and the court shall in the presence of the defendant, his counsel, and the district attorney, further charge the jury. The further charge may be verbal."
In State v. Obney, 505 So.2d 211 (La. App. 3 Cir.1987), writ denied, 508 So.2d 818 (La.1987), we were confronted with a similar *1006 situation. In Obney, after a jury request for a copy of the definitions of second degree murder, manslaughter, and negligent homicide, the judge declined. Defendant's counsel requested that the jury be returned to the courtroom and re-read the definitions. The trial judge declined on the basis that he believed the jury merely desired to have something handy for easy reference insofar as they had already been instructed on four occasions, during voir dire, opening remarks, closing arguments, and in the jury charges. In Obney, we agreed with the trial judge as to why the jury desired written copies, finding that the message from the jury was not a request to be recharged, but was merely a request to obtain copies for easy reference during deliberations.
The underlying reasoning of Obney is that when a jury makes a request, the trial court must use its discretion in determining the reason for the request. Although the trial judge shall recharge the jury at their request for reinstruction under the mandate of La.C.Cr.P. art. 808, the judge must use his discretion as to recharging the jury when they merely ask for a copy of a statute.
In this case, we find that the message from the jury was an indication that they were unclear and confused as to the distinction between second degree murder and manslaughter. Although the judgment call made by the trial court may not rise to the level of reversible error, we find that the trial court did abuse its discretion in not reinstructing the jury at this point as to the possible verdicts. The holding in Obney is distinguishable insofar as, in that case, we found that the jury had been instructed four times prior to their request for a copy of the charges while under the facts in this case, the record is devoid of any evidence that the jury had been charged but once.
We find that, out of an abundance of caution, the trial court should have looked to the true meaning of the jury's query, i.e., their confusion as to the difference between second degree murder and manslaughter, and recharged them as to these possible verdicts. Jurors are laymen, untrained as to the proper form of query. It is the province of the trial court to determine the true source of their confusion or need for information.
We find that this abuse of discretion on the part of the trial judge, together with the facts and circumstances surrounding this case, lend themselves to a determination, that, under the Jackson v. Virginia standard, viewing the evidence in the light most favorable to the prosecution, a rational juror could have found that the mitigating factors were sufficiently shown to convict Nugent of manslaughter rather than second degree murder.

CONCLUSION
Accordingly, the verdict of second degree murder is vacated; a judgment of conviction for manslaughter is rendered; the sentence is set aside; and the case is remanded to the Fourteenth Judicial District Court for sentencing.
REVERSED and REMANDED.
NOTES
[1] "Manslaughter is:

(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; ..."
La.R.S. 14:31(1).