592 So.2d 872 (1991)
STATE of Louisiana, Appellee,
v.
Roney Burton WOMACK, Appellant.
No. 23101-KA.
Court of Appeal of Louisiana, Second Circuit.
December 20, 1991.
*874 J. Michael Small, Alexandria, for appellant.
Jerry Jones, Dist. Atty., Madeleine M. Slaughter, Asst. Dist. Atty., Monroe, for appellee.
Before SEXTON, LINDSAY and BROWN, JJ.
BROWN, Judge.
A Ouachita Parish Grand Jury indicted defendant, Roney Burton Womack, with second degree murder. Defendant entered pleas of not guilty and not guilty by reason of insanity. Rejecting the insanity defense, a jury thereafter found defendant guilty as charged. Defendant received a mandatory life sentence. On appeal, defendant presents eight issues representing 13 of 21 assignments of error.[1] Finding no merit in these claims, we affirm.
On October 13, 1988 the nude body of Marasi Varner was discovered at the end of a rural dirt road in Union Parish. It was determined that she died from strangulation. Believing that the victim was killed in Ouachita Parish and then transported to Union Parish, a coordinated investigation was conducted by the sheriffs' offices of both parishes. Lacking physical evidence linking a suspect to the crime, the investigators directed their energies towards acquaintances of the victim. Defendant, a resident of Union Parish, was one of these acquaintances. On December 1, 1988 defendant was arrested.
The investigation revealed that during the late hours of October 12, 1988 and the early morning hours of October 13, the 19 year old defendant went to the Ouachita *875 Parish home of the 16 year old victim. Although defendant had dated the victim, they had not seen each other for more than a year. In fact, defendant had married since he and the victim had stopped dating.
On the night of this crime, defendant entered the victim's home through an unlocked back door. He found Marasi asleep in bed. After pulling the covers down, he tried to touch her breasts. Defendant said he held her hands and got on top of her while she struggled and screamed for him to leave. Defendant covered her mouth and then put his hands on her throat, choking her until she lost consciousness. He tied a cord from her curling iron around her throat, pulled her off the bed onto the floor and took off her shorts. He started to unfasten his pants but stopped when she made a gurgling sound. He used her shorts to wipe his fingerprints from everything he had touched. After arming himself with a meat cleaver, he dragged Marasi to his car and laid her in the back seat. He then drove to a dead end dirt road in Union Parish and dumped her nude body on a slope covered with vines. Thereafter he went home to his wife. The victim's body was found the next day by a local resident.
An autopsy determined strangulation as the cause of death, possibly with a ligature. The victim had multiple traumatic injuries consistent with having been beaten. A forensic pathologist, Dr. McCormick, characterized this homicide as "a very forceful strangulation" and concluded the victim died after her body was dumped by the roadside.

ISSUE NO. 1: (ASSIGNMENTS OF ERROR 1 and 20)
Defendant contends that his confession and items seized as a result of that confession should have been excluded from use at his trial.
On November 2, 1988, defendant was interviewed at the Union Parish Sheriff's Office by Deputies Witt of Union Parish and Carver of Ouachita Parish. After receiving proper Miranda warnings and signing a valid waiver of his rights, defendant told the deputies that he had known Marasi Varner, that he had previously dated her and they had engaged in sexual relations. Womack told the deputies that although he had been in the Monroe area on the night that Marasi Varner was killed, he was not near her home. He further gave written permission to search his Volkswagen automobile which he was driving on the night of the crime.
On November 15, 1988, Deputies Carver and Willis visited Womack at his home. The purpose of this visit was to obtain measurements of the tires of a Ford Pinto parked in Womack's driveway. The deputies once more advised Womack of his Miranda rights and only after obtaining permission, proceeded to take the measurements.
On November 29, 1988, Deputy Carver spoke with Womack by telephone and requested that he take a polygraph examination. Deputy Carver told Womack that there were three acquaintances of the victim who could not "substantiate through independent testimony, other witnesses and such, their exact whereabouts" and he was asking all of them to take a polygraph test. Womack agreed to take the test and an appointment was made for December 1, 1988. Deputy Carver made it clear that participation in the test was voluntary.
On December 1, Womack drove to the Ouachita Parish Sheriff's Office and asked for Deputy Carver. Deputy Carver took him into a "general purpose interview room" and introduced him to Gus Eberhardt. Carver left defendant and Eberhardt alone. Womack sat across the table from Eberhardt who wore plain clothes. Womack was aware that Eberhardt was not a police officer but was there solely to administer the polygraph test.
At the evidentiary hearing, Eberhardt stated that prior to his meeting with Womack, he had been made to understand that Womack was not a "hot suspect" but that Carver "had a multitude of people he had interviewed, that he didn't have anything real solid evidence-wise and that these people [those being subjected to the polygraph exam] were people who either had a lapse *876 in their time that they told him or something that I was to test them on."
Eberhardt explained to Womack that he could refuse to take the polygraph. Womack indicated that he understood and signed a release form which stated that he could refuse to take the examination and once started terminate the test at any time. Womack understood the nature of the polygraph examination and consented to it. After determining that Womack was agreeable to take the test, Eberhardt told Womack that he would conduct two separate examinations. Eberhardt explained that in the first examination he would ask whether Womack had driven past the victim's house on the night of the murder. During this explanation, Womack spontaneously offered that he had driven by the victim's house on the night of the murder and had previously lied on this point to the deputies. On hearing this, Eberhardt left the interrogation room and consulted with Deputy Carver about the unexpected response.
When Eberhardt returned to the interrogation room he stated he would proceed directly to the second examination. Prior to beginning the test, Eberhardt again explained what questions would be asked and that the main question would be "Did you kill the girl?" Although the test had not begun when Eberhardt stated the primary question that would be asked, Womack answered "yes sir". Eberhardt then left the room and informed Deputy Carver.
When Deputy Carver entered the room, Womack was visibly upset. Deputy Carver offered him a glass of water, which Womack accepted, and Womack was then given an opportunity to compose himself. Carver asked Investigator Jerry Glen Riley to witness the questioning. Carver was reminded by Eberhardt to give Womack his Miranda rights. Once more Miranda warnings were read to Womack who signed a waiver of rights form. Womack then confessed to the murder. Carver obtained Womack's permission to record his confession and once the tape was in operation, again advised him of his Miranda rights. Womack signed yet another waiver of rights card and gave a taped statement.
On the taped statement Womack was asked whether he would like to give a narrative of what happened on the night of the murder or whether he would rather have Deputy Carver ask questions and he responded "Uh ... just ... either way, I mean, with a lawyer, without a lawyer isn't any different ..." Womack now asserts that this was a request for a lawyer which was ignored by the deputies.
On the recorded statement, Womack again confessed his guilt and described where he had disposed of certain evidentiary items. Thereafter, Womack was formally arrested and charged with the murder of Marasi Varner.
The next day, Womack was taken out of his jail cell by Deputy Carver and Assistant District Attorney Robert Noel. At this time, Deputy Carver again read Womack his Miranda rights and obtained another written waiver. Womack showed Deputy Carver and Assistant District Attorney Noel a bridge off of which he had thrown items taken from the victim's house. Later, a diver recovered some of these items which were introduced into evidence at Womack's trial.
Womack contends that he should have been given Miranda warnings before Eberhardt's explanation of the polygraph procedures. He further contends that once he admitted his guilt to Eberhardt all confessions thereafter were tainted because the "cat was out of the bag" and thus not cured by subsequent Miranda warnings.
The U.S. Constitution's Fifth Amendment protects an individual's right against self-incrimination. The Fifth Amendment only prohibits the use of compelled statements as it has always been recognized that voluntary statements are inherently desirable and a legitimate part of law enforcement. The U.S. Supreme Court in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), presumed compulsion of statements taken "in custodial circumstances" unless the suspect is specifically informed of his (Miranda) rights and freely decides to waive those rights. The Miranda warnings require that prior to questioning the suspect be told that he has *877 a right to remain silent, that any statement he does make may be used as evidence against him and that he has a right to the presence of an attorney, either retained or appointed. Miranda warnings "are not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected." New York v. Quarles, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984).
The Miranda court presumed that any interrogation in "custodial" circumstances was inherently coercive and thus required that in such circumstances Miranda warnings be explained and waived before questioning. Oregon v. Elstad, 470 U.S. 298, 306, 105 S.Ct. 1285, 1291, 84 L.Ed.2d 222 (1985). Louisiana's Constitution has enacted the Miranda rule by providing in Article 1 § 13 that a person who is "arrested or detained" be fully advised by investigating officers of his rights before questioning. It is clear that Louisiana's Constitution as well as the Miranda decision requires the administering of warnings whenever "a citizen was deprived of his liberty in a significant way or was not free to go as he pleased." State v. Menne, 380 So.2d 14 (La.1980), cert. denied 449 U.S. 833, 101 S.Ct. 104, 66 L.Ed.2d 39 (1980).
Whether a person has been taken into custody, detained or deprived of his freedom of action in a significant way must be decided on the circumstances of each case. Menne, supra. Neither a defendant's impression nor the formality of an official arrest should be considered determinative. State v. Obney, 505 So.2d 211 (La.App. 3d Cir.1987), writ denied, 508 So.2d 818 (La. 1987). The courts have generally examined factors "indicating the degree the police suspect the person interrogated of committing the offense." State v. Segers, 355 So.2d 238 (La.1978), rehearing granted, 357 So.2d 1 (La.1978) (sentenced affirmed). These factors include the existence of probable cause to arrest, the focus of the police investigation and the reasonable beliefs of the person being questioned. State v. Redic, 392 So.2d 451 (La.1980).
The totality of the circumstances in this case indicate that Womack was not "arrested" or "detained" as intended by Art. 1 § 13 of the 1974 Louisiana Constitution, nor was in a "custodial interrogation" as considered by Miranda, supra, when he talked to Eberhardt.
Deputy Carver first spoke with defendant on November 2, 1988 at the Union Parish Sheriff's Office. Carver explained that they were interviewing acquaintances of the victim. Carver explained to defendant his Miranda rights even though defendant was not in custody. Defendant fully understood that he did not have to answer any questions and was not in custody. At the conclusion of the interview defendant gave written permission to search his vehicle. Defendant was free to leave and did leave. On November 15 the same type of request occurred when Deputy Carver visited defendant's home. Defendant was advised of his Miranda rights, waived those rights and allowed measurements to be taken of the tires on another vehicle at his home. Defendant was not taken into custody and fully understood the purpose and intent of the investigation.
On November 29, Deputy Carver telephoned defendant and explained that he was requesting several people to take a polygraph test as a part of the investigation. Defendant was free to decline but agreed to come voluntarily to Monroe for the test. It was obvious to defendant that he did not have to participate in the test and that he was no more of a suspect than other acquaintances of the victim. Defendant's understanding was demonstrated in that he appeared 30 minutes late for the appointment.
Defendant came to the police station in his own car. Defendant also arranged to be off work that day. Eberhardt told defendant that he did not have to take the test and had defendant sign a form consenting to the test. The meeting with Eberhardt took place in a room commonly used for questioning, was of brief duration, and the door was unlocked. On cross-examination defendant stated that he did not think he was under arrest until the door *878 was locked following his recorded statement. Defendant was free to go at any time while talking with Eberhardt. Defendant was a high school graduate with some college credits.
This court finds no merit to defendant's argument that he was the focus of the investigation when he spoke with Eberhardt as in Menne, supra. In Menne, supra, the defendant had been told by police officers that he was the last person with the murder weapon before the victim's death and they believed he knew more about the crime than he was admitting. In this case, Deputy Carver testified that there were at least three people whose statements could not be corroborated and were therefore being asked to take a polygraph examination. Defendant testified that he understood that more people were to be questioned that day. Eberhardt testified that he was to test several people and that he was not led to believe that defendant was a probable suspect.
When Eberhardt spoke with defendant he was not in custody, detained or arrested and his brief response was not compelled and thus admissible. Once Deputy Carver was informed of defendant's response to Eberhardt, appropriate warnings were given each time prior to questioning. As found in Oregon v. Elstad, supra, the subsequent statements to Deputy Carver were admissible regardless of the unwarned admission to Eberhardt. Miranda does not require that fruits of an unwarned but otherwise voluntary statement be discarded as inherently tainted. Defendant's remarks to Eberhardt were unquestionably not compelled and would not taint the later confessions.
Additionally, under the circumstances of this case defendant's remarks to Eberhardt were not unwarned. Deputy Carver gave correct Miranda warnings on November 1 and November 15 to defendant. Eberhardt repeated that defendant could refuse to take the polygraph test and could stop the test at any time. As in Evans v. McCotter, 790 F.2d 1232 (U.S. 5th Cir.1986), it is incomprehensible that defendant, having been fully warned twice by Deputy Carver and partially warned by Eberhardt, could not have been aware of his rights.
Defendant further claims that his subsequent statements to Deputy Carver should have been ruled inadmissible because they were taken after his request for a lawyer. All the witnesses to the statements denied that defendant ever requested an attorney. The transcript of the recorded confession showed that in response to Deputy Carver's inquiry as to whether defendant wanted to be questioned or just narrate his story, defendant stated:
"Ah .. just .. either way, I mean, with a lawyer, without a lawyer isn't any different."
The statements of an accused, whether exculpatory or inculpatory, when made during a custodial interrogation should be suppressed unless the accused is first advised of and subsequently waives his right to remain silent and his right to counsel. Miranda, supra; La. Const. Art. 1 § 13. When an accused asserts his right to counsel, the police must scrupulously honor the invocation of the right and interrogation must cease. Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); State v. Harper, 430 So.2d 627 (La.1983); State v. Phillips, 479 So.2d 515 (La.App. 1st Cir.1985), writ denied, 484 So.2d 667 (La.1986).
Defendant's statement is not a clear request for an attorney. It is a simple declarative remark which, in fact, appears to be a waiver of counsel.

ISSUE NO. 2: (ASSIGNMENT OF ERROR 2)
Defendant argues the trial court erred in refusing to allow the introduction into evidence of the victim's past sexual behavior.
Prior to trial, the state filed a motion in limine to restrict character evidence against the victim. In response, defendant filed an in camera motion to offer evidence of the victim's past sexual behavior pursuant to La.Code of Evidence Art. 412(B)(2) with an attached statement of evidence. The trial court ruled that it would:

*879 ... permit a limited inquiry into the victim's sexual relationship with the defendant alone. And any other matters alluded to in the offering by counsel, any other sexual conduct alluded to, referred to or made the subject of that motion will be excluded from evidence.
This meant that any sexual activity by the victim with a person other than defendant would be excluded.
The alleged excluded evidence was that after having sexual intercourse with defendant, the victim immediately had sexual intercourse with one of his friends. Defendant argues that this evidence would tend to show the reasonableness of his belief that he could appear at the victim's house and she would voluntarily submit to sex.
When an accused is charged with a crime involving sexually assaultive behavior, evidence of specific instances of the victim's past sexual activity generally is not admissible. Evidence of past sexual involvement with the accused will be admissible when offered by the accused upon the issue of whether or not the victim consented to the sexually assaultive behavior. LSA-C.E. Art. 412(B) (emphasis added).
The Louisiana Supreme Court has indicated that a restriction of a defendant's offer to introduce testimony as to the victim's prior sexual history may violate defendant's right to confrontation and fair trial. State v. Vaughn, 448 So.2d 1260 (La.1983); LSA-C.E. Art. 412 comment (b). The Federal Rules of Evidence have addressed this problem by explicitly providing for the admissibility of some evidence of a victim's past sexual behavior when such evidence is constitutionally required to be admitted. In criminal matters, the articles of the Louisiana Code of Evidence must be interpreted and applied in light of and within the confines mandated by the Louisiana and Federal Constitutions. LSA-C.E. Art. 102 comment (b). The constitutional "exception" to LSA-C.E. Art. 412 "is intended to cover those infrequent instances where, because of an unusual chain of circumstances, the general rule of inadmissibility, if followed, would result in denying the defendant a constitutional right." House of Representatives, 120 Cong.Rec. 34, 912 (1978). In Vaughn, supra, the Louisiana State Supreme Court concluded "that evidence of a single instance of sexual intercourse between the victim and another individual five days prior to the rape is not relevant to a determination of whether the act with defendant was consensual." Further, the Supreme Court held that where the evidence sought to be admitted is not relevant, the right to confrontation is not affected. Vaughn, supra.
In the instant case, the alleged incident of sexual intercourse with another was over a year old. Defendant has failed to demonstrate how the victim's outdated act of intercourse with another would be genuinely probative of her expected consent to engage in intercourse on the night in question. Further, defendant was charged with second degree murder and has never contended that his actions were justified. Defendant has failed to show how his constitutional rights were violated in this instance. We find this assignment to be without merit.

ISSUE NO. 3: (ASSIGNMENT OF ERROR 5)
By this assignment, defendant asserts the trial court erred in denying his motion for a mistrial and in denying his alternative request for new jurors when the assistant district attorney stated during voir dire that the law presumes the defendant intends the natural and probable consequences of his actions.
During voir dire, the prosecutor stated:
The law in Louisianathere are certain legal presumptions, but these presumptions may nonetheless by rebutting evidence [sic]. In other words, just because there's a presumption, doesn't mean that the other side can't cut it down and rebut it. One presumption is that the defendant intended the natural and probable consequences of his act.
Defendant objected on the basis of Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979) and State v. Heads, 385 So.2d 230 (La.1980), and moved *880 for a mistrial. The court directed the prosecutor to stop that line of questioning and denied the motion for mistrial. Defense counsel then moved that that particular 12 member panel of prospective jurors be replaced by a new group of 12 for further voir dire, which motion was denied. The court admonished the jurors that the prosecutor's statement of the law was incorrect and incomplete and that they were to disregard it.
Mistrial is a drastic remedy and should be declared only when unnecessary prejudice results to the accused. State v. Smith, 430 So.2d 31 (La.1983); State v. Alexander, 351 So.2d 505 (La.1977). The determination of whether prejudice has resulted lies within the sound discretion of the trial judge. Smith, supra; State v. Haynes, 339 So.2d 328 (La.1976); State v. Hardeman, 467 So.2d 1163 (La.App. 2d Cir.1985).
Both Sandstrom and Heads condemned jury charges that could be interpreted as either shifting to the defendant the burden of proving intent or as creating a conclusive presumption of intent. Here, there was no such instruction by the court. Rather, the statement was made during voir dire by the prosecutor before the jury was impaneled and the court immediately admonished the jurors to disregard it.
In State v. Brumfield, 263 La. 147, 267 So.2d 553 (1972), the court found no error in denial of a motion for mistrial based upon improper questions by the prosecutor during voir dire when the trial court admonished the jury to disregard the improper remark.
Except in instances in which a mistrial is mandatory, it is warranted only when trial error results in substantial prejudice to the defendant depriving him of a fair trial. State v. Cushenberry, 407 So.2d 700 (La. 1981). The prosecutor's statement in this instance is not listed in LSA-C.Cr.P. Art. 770 as a mandatory basis for a mistrial.
Since the remark was made by the prosecutor, not the judge, and since the court properly admonished the jury to disregard the remark because it was an incorrect statement, there does not appear to be any prejudice to defendant from denial of his motions for mistrial or alternatively to replace the panel.

ISSUE NO. 4: (ASSIGNMENT OF ERROR 8)
By this assignment, defendant argues the trial court erred in allowing Eberhardt to testify to his reason for coming to Louisiana, namely, to administer polygraph examinations. Defendant relies on State v. Mills, 505 So.2d 933 (La.App. 2d Cir.1987), writ denied, 508 So.2d 65 (La.1987), to support his claim that any reference to a polygraph examination is error.
Eberhardt testified that he traveled to the Ouachita Parish Sheriff's Office to participate in a polygraph examination. The testimony of Eberhardt showed that defendant was willing to take the test but that no test was administered due to defendant's confession. Thus, no test results were offered.
Polygraph evidence is inadmissible for any purpose in criminal trials in Louisiana. State v. Hocum, 456 So.2d 602 (La.1984). Thus, it is appropriate to grant a motion in limine which requires the parties to refrain from any reference to the fact that a polygraph examination was conducted even where the defendant passed the exam. Mills, supra. Defendant did not make a motion in limine, as in Mills, supra, to preclude mention of any reference to the word "polygraph".
Even though any reference to the results of a polygraph test would be improper, an appellate court will not automatically reverse a conviction whenever an impermissible reference to a polygraph exam is made during a criminal trial. A reversal and new trial are required only if there is a reasonable possibility that the error complained of might have contributed to the conviction. Hocum, supra; State v. Semien, 566 So.2d 1032 (La.App. 3d Cir.1990), writ denied, 569 So.2d 960 (La.1990).
This brief, unsolicited reference to "polygraph" was not an impermissible or erroneous reference to test results. The *881 statement by defendant to Eberhardt before the start of the proposed test was admissible. The circumstances surrounding the statement to Eberhardt were admissible to prove its credibility. Accordingly, this assignment has no merit.

ISSUE NO. 5: (ASSIGNMENT OF ERROR 12)
Defendant objects to the admission of an autopsy photograph of the victim's tongue, arguing the probative value of the photograph was outweighed by its prejudicial effect.
The forensic pathologist, Dr. McCormick, used this exhibit during his testimony concerning the cause of death. It demonstrated the basis of Dr. McCormick's opinion that the victim was forcibly strangled with a ligature.
The test of admissibility for gruesome photographs is whether their probative value outweighs the possible prejudice which may result from their display to the jury. State v. Matthews, 354 So.2d 552 (La.1978); Mills, supra.
This challenged photograph was not the only visual evidence of the victim. The jurors saw a videotape of the body at the scene where it was discovered and they viewed other photographs of much greater prejudice.
This photograph was probative and relevant. In fact, the unduly grotesque features were removed from the exhibit by cutting off a portion of the photograph. Under these circumstances, the probative value was not outweighed by possible prejudice.

ISSUE NO. 6: (ASSIGNMENTS OF ERROR 13 and 14)
Defendant contends that the trial court erred in allowing the Assistant District Attorney to question defendant's expert witness, Dr. Paul Ware, as follows:
(a) Regarding Dr. Ware's opinion of the Tarasoff case which held that a psychiatrist owed a duty to a potential victim of the psychiatrist's client; and
(b) Regarding cases other than the present one where Dr. Ware testified for defense counsel and his diagnosis in those cases.
Defendant argues that the cumulative effect of allowing these questions was deprivation of a fair trial but cites no authority. The state argues that the first question was necessary to probe the basis of this expert's opinion of defendant's state of mind. The state argues the second set of questions was merely an attempt to impeach Dr. Ware's credibility or to explore his possible bias.
A party is allowed during crossexamination to test the bias and reliability of an expert witness's opinion, State v. Dawson, 392 So.2d 445 (La.1981), and to attempt to impeach his credibility, State v. Pruitt, 482 So.2d 820 (La.App. 4th Cir. 1986), writ denied, 488 So.2d 1018 (La. 1986); State v. Bradley, 490 So.2d 474 (La.App. 4th Cir.1986), writ denied, 494 So.2d 325 (La. 1986).
The trial court has wide discretion in controlling the examination of witnesses on collateral matters. The determination of the relevancy of any testimony also lies within the discretion vested in the trial court. State v. Taylor, 347 So.2d 172 (La. 1977). The trial court did not abuse its discretion in allowing these questions to be asked of the witness to explore the basis for his opinion and the possibility of bias. These questions were not asked merely to inflame the jury. There is no prejudice, no error and therefore no merit to this assignment.

ISSUE NO. 7: (ASSIGNMENT OF ERROR 15)
In this assignment, defendant contends that the trial court should not have excused a juror during the course of the trial. The juror, Ms. Tasby, was having difficulty in understanding and felt scared. Ms. Tasby stated she was having headaches and was continuously mopping her brow with a towel to keep her eyes open. She had fallen asleep several times during the trial and the bailiff testified that other *882 jurors had complained that during breaks she was inflaming them and crying. Also the bailiff was told that other jurors were distracted by Ms. Tasby's sleeping in the courtroom.
Article 789 of the Louisiana Code of Criminal Procedure provides in part:
Alternate jurors ... shall replace jurors who become unable to perform or disqualified from performing their duties prior to the time the jury retires to consider its verdict.
It is error to remove a juror for dozing off briefly, State v. Cass, 356 So.2d 396 (La.1978), or for merely closing his eyes while a transcript is read, State v. Johnson, 463 So.2d 620 (La.App. 1st Cir. 1984). The trial court has discretion to use the services of an alternate juror, rather than to grant a mistrial, upon a proper finding that this is the best course of action. State v. Fuller, 454 So.2d 119 (La. 1984). Ms. Tasby's problems were more severe, of a longer duration and of a highly distracting nature to her fellow jurors than just dozing off or closing her eyes briefly.
It was not an abuse of discretion to replace Ms. Tasby with an alternate juror. She obviously was sick to the point of being unable to perform her duties and was hindering her fellow jurors in the performance of their duties. This assignment is without merit.

ISSUE NO. 8: (ASSIGNMENTS OF ERROR 16, 17, 18 and 19)
In these assignments, the defendant contends that the trial court erred in its jury instructions. The alleged improper instructions were as follows:
(a) "But such experts are not called into court for the purpose of deciding the case. You, the jurors, are the ones who, in law, must bear the responsibility of deciding the case."
(b) "The fact that the defendant may possess some peculiar mental or physical characteristics not possessed by the ordinary person which caused him to lose his self-control is not to be considered in measuring the adequacy of the provocation alleged as a defense."
(c) "Louisiana does not recognize the doctrine of diminished capacity. Therefore, a mental defect short of legal insanity cannot serve to negate specific intent and, thus, reduce the degree of a crime."
(d) "A person in law is said to be insane when, as a result, of some disease of the mind he is unable [to] contemplate or foresee the usual, probable, natural, and reasonable consequences of his acts."
Defendant does not challenge the legality of the first three of these four instructions but argues that they (a) denigrated the expert testimony, (b) denigrated the insanity defense, and (c) prejudiced the insanity defense. On the fourth instruction (d) defendant argues that it does not correctly state the law concerning the defense of insanity.
The language used in an instruction must be viewed in its overall context. Relief cannot be based on an isolated sentence even though that particular sentence might itself reflect a misstatement of the law. Rather the particular language will be considered with other language in the jury charge to determine if it is erroneous and prejudicial. State v. Motton, 395 So.2d 1337 (La.1981), cert. denied sub nom. Motton v. Louisiana, 454 U.S. 850, 102 S.Ct. 289, 70 L.Ed.2d 139 (1981).
After giving the protested instruction on insanity the trial court continued to state:
"In other words, a person is legally insane when he is unable to distinguish between right and wrong. Legal insanity in Louisiana means that a defendant has a mental disease or defect which prevents him from distinguishing right from wrong with reference to the conduct which forms the basis for the criminal charge against him."
Considering the jury instructions in context, the language objected to was neither erroneous nor prejudicial. The remaining instructions which were objected to likewise were not improper. LSA-R.S. 14:14; State v. Andrews, 369 So.2d 1049 (La. *883 1979); State v. Pier, 530 So.2d 1253 (La. App. 2d Cir.1988), writ denied, 536 So.2d 1234 (La.1987); State v. Pettaway, 450 So.2d 1345 (La.App. 2d Cir.1984), writ denied, 456 So.2d 171 (La.1984).
These instructions when viewed in context of the entire jury charge did not cause a miscarriage of justice, prejudice the accused or his defense, misstate applicable law, confuse or mislead the jury or constitute a violation of a constitutional or statutory right. Accordingly, this assignment is without merit.
AFFIRMED.
NOTES
[1] Assignment of error numbers 3, 4, 6, 7, 9, 10, 11 and 21 were neither briefed nor argued in brief. Therefore, they are deemed abandoned. URCA Rule 2-12.4; State v. Schwartz, 354 So.2d 1332 (La.1978); State v. Kotwitz, 549 So.2d 351 (La.App. 2d Cir.1989), writ denied, 558 So.2d 1123 (La.1990).