864 So.2d 89 (2003)
STATE of Louisiana
v.
Michael D. LEGRAND.
No. 2002-KA-1462.
Supreme Court of Louisiana.
December 3, 2003.
Opinion Granting Rehearing in Part February 6, 2004.
*92 G. Benjamin Cohen, R. Neal Walker, Marcia A. Widder, for Applicant.
Richard P. Ieyoub, Attorney General, Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Asst. District Attorney, Juliet L. Clark, Terrytown, Vincent Paciera, Jr., New Orleans, Donald A. Rowan, Jr., for Respondent.
VICTORY, J.
This is a direct appeal under Article V, Section 5(D) of the Louisiana Constitution. The defendant, Michael D. Legrand, was indicted for the first-degree murder of Rafael Santos, in violation of La. R.S. 14:30(A)(1)(specific intent homicide committed in the course of an armed robbery). Following a trial, a jury found the defendant guilty as charged and, after a sentencing hearing, unanimously recommended a sentence of death. The trial court sentenced the defendant to death in accordance with that recommendation. The defendant now appeals his conviction and sentence, raising 53 assignments of error. After a thorough review, we conclude that none of the assignments of error raised by the defendant merits reversal, and we therefore affirm the defendant's conviction and sentence.

FACTS AND PROCEDURAL HISTORY
On May 18, 1999, Rafael Santos' body was found in his apartment after he failed to appear for work and his co-workers became concerned. His autopsy revealed that he had been stabbed over 25 times and that three of those wounds were fatal. He was stabbed with a variety of utensils including plastic and wooden handled knives, screwdrivers and scissors, all taken from Mr. Santos' apartment.
Sergeant Grey Thurman, a member of the Jefferson Parish Sheriff's Office's Homicide Section, arrived on the scene to investigate the murder. He noticed that the victim had clearly been dead for several days and that an apparent struggle had taken place before his death. Furniture, glasses and ashtrays had been knocked to the floor, the telephone cord had been cut, and the telephone was on the floor. There were also broken pieces of knife blades, knife handles, bent knives, screwdrivers and scissors strewn about the room. Sergeant Thurman also noted the large amount of blood and number of injuries the victim sustained.
From his investigation, Sergeant Thurman was able to develop the defendant as a suspect in the case and subsequently obtained a warrant for his arrest. After the defendant was arrested, Sergeant Thurman advised him of his Miranda rights and took two statements from him.
*93 In his first statement, the defendant admitted that he knew the victim and that he had visited him frequently in the past. In his second statement, the defendant admitted that he had thought about stealing the victim's extensive CD collection so that he could pawn the discs to make some money. The defendant told Sergeant Thurman that a few weeks before the murder, he and his friend Clayton Runnels went to the victim's apartment intending to steal the victim's CDs and that the victim, a friend of the defendants, let the two men in, but they were unable to steal the CDs because the victim was on his way to work and asked them to leave. In addition, he told Sergeant Thurman that after his first attempt to steal the CDs, he returned to the victim's apartment alone and when he saw that Santos was not at home, he unsuccessfully attempted to kick in the front door.
The defendant related to Sergeant Thurman that on the night of the murder, May 15, 1999, he returned to the victim's apartment accompanied by Judy Fairless. The defendant knocked on the door while Fairless waited in the car. Santos opened the door and let the defendant enter his apartment. The defendant immediately went to the victim's refrigerator to get a Coke and then sat on the couch with the victim. The defendant stated that a kitchen knife was lying on the table in front of the sofa. Santos and the defendant talked for a couple of minutes before the defendant picked up the knife and said to the victim, "dude I'm sorry, I don't have a choice." The defendant then told the victim that he was going to take some of his CDs. Santos then stood up and went after the defendant. The defendant recalled that Santos yelled out the defendant's name as the defendant stabbed him. He recalled stabbing Santos "everywhere," and specifically remembered cutting his throat.
The defendant claimed that he did not remember retrieving the other knives and objects that were used to stab the victim, but he did recall that after he "woke up" he remembered "seeing two knives, a black handle knife and a white handle knife." After seeing the victim lying on the ground, the defendant loaded the CDs into duffel bags and a laundry basket and handed them over the fence to Fairless. He also took money from the victim's wallet. The defendant then attempted to clean the blood from his face, hands and legs while in the victim's apartment, and eventually took his clothes off and changed into a shirt and a pair of shorts belonging to the victim.
The defendant's efforts at cleaning the blood off himself were unsuccessful. Around five a.m., after the murder, the defendant went to the apartment of his neighbors, Francine Flick and Kevin Brown, and knocked on the door. Flick answered the door and saw that the defendant had blood on his face, shirt, hands and shoes. She also noticed that the defendant was nervous and agitated. Brown also saw the defendant in his bloodstained clothes. When Brown asked the defendant what happened, the defendant told him that he "... went to the guy's house to get the CDs, and the guy tried to stop him, and he stabbed him." The defendant went on to tell Brown that he stabbed the victim with a "bunch of knives" or whatever he could reach.
A few days later, the defendant, along with his friend Clayton Runnels went to Warehouse Music to sell the CDs. In exchange for Runnels's help, the defendant gave him $30.00 out of the $300.00 that the music store paid for the CDs.[1]
*94 On July 8, 1999, a Jefferson Parish grand jury indicted the defendant for the first-degree murder of Rafael Santos, a violation of R.S. 14:30. At trial, the state presented testimony from several witnesses linking the defendant to the crime. It also introduced into evidence both of the defendant's audio taped statements. Although the defense never contested that the defendant had in fact committed the homicide, the defense introduced the testimony of one witness, Dr. McGarrity, who testified in support of the defense of voluntary intoxication. The defense's main argument at the guilt phase focused on rebutting evidence of the defendant's specific intent to kill by relying on the defense of voluntary cocaine intoxication and the fact that the defendant entered the victim's apartment unarmed.
The jury subsequently found the defendant guilty of first degree murder. The following day, the trial court conducted the capital sentencing hearing. The state first reintroduced all of its evidence from the guilt phase. Next, the state called the victim's sister, Barbara Hoffman, to testify regarding victim impact evidence. The defense presented testimony from six witnesses including family members, a licensed psychologist, and a social worker.
Following the penalty phase, the jury returned with a recommendation of death after finding both of the aggravating circumstances advanced by the state: (1) that the offender was engaged in the perpetration or attempted perpetration of an armed robbery; and (2) that the offense was committed in an especially heinous, atrocious or cruel manner. La.C.Cr.P. art 905.4(A)(1), (7). The trial court formally sentenced the defendant to death by lethal injection on January 12, 2001. The defendant now appeals his conviction and sentence to this Court urging 53 assignments of error.[2]

DISCUSSION

Assignment of Error No. 36
The defendant claims that the state failed to prove beyond a reasonable doubt that the defendant had the specific intent to kill or inflict great bodily harm at the time of the crime and that his conviction must be reversed.
"In reviewing the sufficiency of the evidence to support a conviction, an appellate court in Louisiana is controlled by the standard enunciated by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ... [T]he appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." State v. Captville, 448 So.2d 676, 678 (La.1984). Specific intent can be formed in an instant. State v. Cousan, 94-2503 (La.11/25/96), 684 So.2d 382, 390. Additionally, specific intent may be inferred when the circumstances indicate that the offender actively desired the prescribed criminal consequences of his act. La. R.S. 14:10(1). Moreover, in the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. State v. Jones, 97-2591 *95 (La.App. 4 Cir. 9/8/99), 744 So.2d 165, 169, writ denied, 99-3141 (La.4/7/00), 759 So.2d 91; State v. Ford, 28,724 (La.App. 2 Cir. 10/30/96), 682 So.2d 847, 849-50, writ denied, 99-210 (La.5/14/99), 745 So.2d 12.
First degree murder is defined in La. R.S. 14:30 as follows:
A. First degree murder is the killing of a human being:
(1) When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of ... armed robbery ...
The defendant's statement alone clearly established that he went to the victim's home, armed himself with a dangerous weapon, attempted to take the CDs from the victim's immediate control by force, and that he killed the victim to accomplish this purpose. The evidence presented by the state established beyond a reasonable doubt that the defendant cut, stabbed, and punctured the victim a minimum of 25 times, using knives, scissors, and screwdrivers, which the defendant retrieved from the victim's apartment. The defendant cut the victim's throat, stabbed the victim in the back of the head, and inflicted 13 puncture wounds and two stab wounds upon the victim's back. He drove a Phillips screwdriver into the victim's head with such force that he left a star-shaped impression in the victim's skull, left another such puncture wound in the victim's temple, and inflicted five puncture wounds in the victim's chest, three of which perforated the victim's pulmonary artery. The broken knives and different types of wounds support the reasonable inference that as one weapon broke or proved insufficient to injure the victim with enough severity, the defendant sought additional knives and other weapons (scissors, screwdrivers) from the nearby kitchen drawers, to accomplish his aim of killing the victim. The evidence of specific intent to kill or to inflict great bodily harm was overwhelming.
The defendant's claim that he could not have had the specific intent to kill the victim because he did not enter the victim's home with a weapon, is unfounded. As noted above, specific intent can be formed in an instant, and it is not relevant that the defendant waited to arm himself after he entered the residence.
The defendant also claims that he armed himself and stabbed the victim only after the two became involved in a struggle. However, this statement seems to misstate the evidence and the defendant's confession. In his confession, the defendant told Detective Thurman that he picked up the knife before he told the victim that he was going to take his CDs. The defendant stated, "I told him, I said, I'm sorry dude, I picked up the knife and I said, I'm sorry, II'm ayou know II wanna take some of your CDs man." It was at this time that the victim resisted and attempted to defend himself. The defendant did not just stab the victim as his brief suggests, but was the aggressor in a violent armed robbery, stabbing the victim as he attempted to resist the defendant's assault.
The defendant's last argument is that because he was under the influence of cocaine at the time of the murder, he was unable to form the requisite specific intent to kill. According to La. R.S. 14:15(2), the fact that the offender is in an intoxicated or drugged condition at the time of the commission of the crime is immaterial except:
(2) Where the circumstances indicate that an intoxicated or drugged condition has precluded the presence of a specific criminal intent or of special knowledge *96 required in a particular crime, this fact constitutes a defense to a prosecution for that crime.
The jury obviously rejected the defendant's argument that he was so drugged or intoxicated that he could not form the requisite specific intent to kill. La. R.S. 14:15(2); State v. Davis, 92-1623 (La.5/23/94),637 So.2d 1012, 1020. As the ultimate fact finder, the jury determines whether a defendant has proven his condition and whether the State negated that defense beyond a reasonable doubt. Id. The defendant, in his audio taped confession, did not allege that he was under the influence of cocaine at the time of the commission of the murder, nor did he alleged that he was under the influence at the time he gave his confession. Sergeant Thurman, the arresting officer, noted that the defendant did not appear to be intoxicated at the time of his arrest or statement. Although several witnesses testified as to the defendant's past drug use, none testified that they observed him using drugs on the night of the murder, nor did anyone note that he appeared to be in a drugged condition after the murder.
The defendant's actions clearly belie any claim that the defendant was unable to form the specific intent to kill the victim due to drug intoxication.[3] The jury evidently made a credibility determination and rejected the defendant's defense. The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness; thus, a reviewing court may impinge on the "fact finder's discretion only to the extent necessary to guarantee the fundamental due process of law." State v. Mussall, 523 So.2d 1305, 1310 (La.1988). Based on the overwhelming evidence presented by the state, it is not unreasonable for the jury to conclude that the defendant had the requisite specific intent.

Assignment of Error No. 35
The defendant further asserts that the evidence was insufficient to support the jury's finding at the penalty phase that the offense was committed in a heinous, atrocious or cruel manner under La. C.Cr.P. art. 905.4(A)(7).
Under our law, an offense must meet the following criteria to qualify as especially heinous, atrocious, or cruel:
This Court has long required a narrowing construction, requiring that there must exist elements of torture, pitiless infliction of unnecessary pain or serious bodily abuse prior to death to support this aggravating circumstance. State v. Brogdon, 457 So.2d 616, 630 (La.1984), cert. denied, 471 U.S. 1111, 105 S.Ct. 2345, 85 L.Ed.2d 862 (1985); State v. Sawyer, 422 So.2d 95, 101 (La.1982); State v. Sonnier, 402 So.2d 650, 659 (La.1981), cert. denied, 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1412 (1983). Further, the murder must be one in which the death was particularly painful and carried out in an inhuman manner. State v. Baldwin, 388 So.2d 664, 677 (La.1980). A finding that the wounds were inflicted to kill, not to maim or inflict pain, may but does not necessarily preclude a finding that the murder was especially heinous, atrocious or cruel. *97 State v. Tassin, 536 So.2d 402, 411 (La. 1988).
State v. Bowie, 00-3344 (La.4/3/02), 813 So.2d 377, 394, cert. denied, 537 U.S. 951,537 U.S. 951, 123 S.Ct. 416, 154 L.Ed.2d 297 (2002). This Court has affirmed findings that the offense was committed in an especially heinous, cruel, or atrocious manner in numerous cases involving stabbings.[4]
In the instant case, the victim was stabbed over 25 times, with a variety of weapons. Of these 25 wounds, only three of them actually caused his death. These three wounds, inflicted with a Phillips head screwdriver, punctured the victim's pulmonary artery which caused him to bleed to death. The other wounds the victim suffered included a number of defensive wounds, described by the medical examiner as incised wounds to the palms of the victim's hand which indicated that he put his hands up in the struggle to defend himself from his assailant. There was also a star shape wound embedded in the victim's skull, which was also caused by a Phillips head screwdriver. The medical examiner indicated that the victim was alive when his throat was cut, a 13 cm wound which penetrated skin and underlying musculature, but did not involve the major vascular structures of the neck.
In this case, the jury considered the evidence and determined that the crime was committed in an especially heinous, atrocious, and cruel manner. The testimony of the medical examiner clearly supports this finding. At any rate, this Court has held on numerous occasions that the failure of one or more statutory aggravating circumstances does not invalidate others, properly found, unless introduction of evidence in support of the invalid circumstance interjects an arbitrary factor into the proceedings. State v. Bowie, supra at 395-396 (citing State v. Wessinger, 98-1234 (La.5/28/99), 736 So.2d 162, 192); State v. Letulier, 97-1360 (La.7/8/98), 750 So.2d 784, 799. The state presented sufficient evidence to prove the other aggravating circumstance found by the jury, that is, that the defendant murdered the victim while engaging in an armed robbery or the attempted perpetration of an armed robbery. In the instant case, no arbitrary factors were interjected into the proceedings, as the evidence presented by the state, including the medical examiner's evidence concerning the number of the victim's wounds and the nature of the victim's injuries, was highly relevant and sufficient for the jury to conclude that the murder was committed in an especially heinous, atrocious and cruel manner. Accordingly, this assignment of error is meritless.

Assignments of Error Nos. 1-8
The defendant asserts that his rights to due process, a fair trial and a reliable sentencing determination were denied by a series of trial court errors surrounding the *98 state's principal witness testifying that he had passed a polygraph examination.
This Court has long adhered to the view that lie detector or polygraph test results are inadmissible for any purpose at the trial of guilt or innocence in criminal cases. Consistent with this view, the Court has "made it clear" that the rule excluding polygraph evidence "also operates to prevent any reference during trial to the fact that a witness has taken a polygraph examination with respect to the subject matter of his testimony." State v. Hocum, 456 So.2d 602, 604 (La.1984); State v. Tonubbee, 420 So.2d 126, 132 (La. 1982), cert. denied, 460 U.S. 1081, 103 S.Ct. 1768, 76 L.Ed.2d 342 (1983); State v. Davis, 407 So.2d 702, 706 (La.1981); State v. Catanese, 368 So.2d 975, 981 (La.1979). Such evidence is prohibited because it "invites a probable inference by the jury that the witness passed the polygraph examination and therefore is testifying truthfully." Hocum, supra at 604-605. Moreover, this Court has held that polygraph information and test results are inadmissible "either as substantive evidence or as relating to the credibility of a party or witness." State v. Humphrey, 445 So.2d 1155, 1158 (La.1984) (quoting Tonubbee, supra at 132).
However, "[e]ven though any reference to the results of a polygraph test would be improper, an appellate court will not automatically reverse a conviction whenever an impermissible reference to a polygraph exam is made during a criminal trial." State v. Womack, 592 So.2d 872, 881 (La.App. 2 Cir.1991), writ denied, 600 So.2d 675 (La.1992).[5] A reversal and new trial are required only if there is a reasonable possibility that the error complained of might have contributed to the conviction. Hocum, supra at 604-605; State v. Semien, 566 So.2d 1032 (La.App. 3 Cir. 1990), writ denied, 569 So.2d 960 (La. 1990).
In the instant case, Clayton Runnels took the stand and described for jurors how he and the defendant "discussed going to Mr. Rafael's apartment and beating him up and taking his property," an idea Runnels attributed to the defendant. He testified that some time later he had accompanied the defendant to the victim's apartment before the murder in an abortive attempt to steal the victim's CDs. According to Runnels, the victim let them into the apartment and he and Runnels smoked some marijuana. While at the apartment, the defendant went into the kitchen looking for scissors to cut a cigarette, and while the victim's back was turned, the defendant picked up a knife from the victim's kitchen and made stabbing motions behind the victim's back. According to Runnels, he frantically waved at the defendant to deter him from any actual attack, and after the victim advised them that he had to go to work, Runnels and the defendant left the apartment.
During cross-examination, Runnels acknowledged that while he had been arrested initially for accessory after the fact to murder, he had pled guilty to a reduced charge of accessory to simple robbery. Although he had entered that plea a year before trial, Runnels had not been sentenced on that conviction, nor had his other pending drug charges allotted to the same section of court been resolved. Runnels *99 had also been aware of the nature of the charges against the defendant from media coverage of the murder. Defense counsel vigorously questioned the witness in an attempt to establish that Runnels was altering some aspects of his testimony in order to receive favorable treatment in his own case:
Q. Okay. And isn't it true that you're exaggerating your testimony regarding the stabbing motion because you knew about the stabbing before you gave the statement? You're exaggerating your testimony about him saying, Let's go beat up the guy to get the CD's, because you wanted help in your case. Isn't that true?
A. No.
Q. Isn't that true, a case that they told you you werethey advised you of your rights for accessory after the fact of first degree murder, that the D.A.'s office accepted accessory to simple robbery; isn't that true?
A. The charge of accessory to simple robbery was presented after I took a polygraph test, and they realized that I was
Mr. Dohre [defense attorney]:
I'm going to object, your Honor.
The trial court overruled the objection stating that the defense "opened the door" and it allowed the witness to finish his answer. Runnels then stated that "I was originally arrested on accessory to murder... And I took a polygraph test, which let Detective Thurman know that I was telling the truth, that I did not help Michael kill this man." The trial court then refused to admonish the jury and refused to allow the defense attorney to ask more questions about the polygraph examination.[6]
The defendant claims error with the trial court's overruling defense counsel's objection to Runnels' reference to the polygraph examination, allowing the witness to complete his answer, refusing to admonish the jury and refusing to allow the defense attorney to ask more questions about the polygraph examination. First, we find that the trial court did not err in overruling the defense objection to Runnels's comment during cross-examination. Runnels's mentioned the polygraph in an effort to bolster his disclaimer that he had nothing to do with the actual murder, a point the defense never contested. He mentioned that he took a polygraph test in response to the defense attorney repeatedly asking him about the fact that less serious charges were accepted by the state. In an effort to explain the state's decision to charge him with the less serious crime, he simply offered what he believed to be the reason that the charges were lessened.
After having had the door opened to this testimony, it was only fair for the trial judge to allow the witness to complete his answer. In fact, in finishing his answer, he stated that the polygraph test "let Detective Thurman know that I was telling the truth, that I did not help Michael kill this man," which actually clarified that the polygraph related only to Runnels' lack of participation in the murder.
Following that, it was not erroneous for the trial court to curtail any other questions concerning the polygraph examination. Runnels' reference to the polygraph examination did not relate to any *100 fact genuinely at issue, as the defendant acknowledged that Runnels had nothing to do with the murder and the testimony was relevant only to Runnels' explanation of why he believed that he was charged with a lesser crime. In allowing further questioning in regards to the polygraph examination, the trial court would have only allowed the introduction of inadmissible and irrelevant evidence.
The defense attorney requested that the jury be admonished about the admissibility of the polygraph, but the trial court denied it, stating, "We're not mentioning a polygraph."[7] According to La. C.Cr.P. art. 771, an admonishment is proper when a witness makes a remark or comment that is "irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state in the mind of the jury." La.C.Cr.P. art 771. In this case, Runnels' remark was relevant to the question asked of him by the defense attorney. Runnels was simply attempting to explain why the charges against him were reduced after his arrest. The fact that the charges were reduced after the polygraph only serves to prove the fact that Runnels did not help the defendant kill the victim, a fact that was not disputed by the defense and therefore was not prejudicial.[8]
The defense further argues that the state was allowed to exploit defense counsel's mistake of opening the door to Runnels mentioning of the polygraph examination during its rebuttal closing argument at the guilt phase which referenced Runnel's testimony. In its closing at the guilt phase, defense counsel referred to the polygraph examination as follows:
But what I am saying is that he knows that he has a sentencing awaiting him, and he knows that he has an open charge awaiting him. Both that he said have been or he was told would be continued until after his trial. And he knows when he talked to the police that night that they had booked him with accessory to murder, first degree murder. And he knows that. And he needs information to help himself. He's not going to say he was there and that's, you know, nobody, nobody, I never suggested to Clayton Runnels that he was there, okay on the night of the murder. He was there before. He admitted that. But I'm talking about the night of the murder. I never suggested to him that he was there, so when he passed the polygraph tests about him being there, I never suggested that. And I certainly didn't meant to suggest that, because I know he wasn't there.
Following this, the prosecutor, in his rebuttal closing argument at the guilt phase, discussed Runnels' testimony:
And he pled guilty to an accessory after the fact to a simple robbery. Why is that? Because that was his intent, was to participate in a simple robbery, no weapons. Not accepting it. Don't justify it. But that's what it was.
And he told you he passed the polygraph test. Notthere wasn't any limitations on his passing the polygraph test. He was telling you the truth.
At the conclusion of the state's closing argument, the defense objected and now strenuously argues that the state's remarks in closing may have led the jury to *101 believe that the polygraph covered all areas of Runnels' testimony, including the testimony that the defendant made the stabbing motions on a prior visit to the apartment and had told Runnels that he would beat the victim if need be to get the CDs, and is therefore reversible error under Hocum.
Louisiana jurisprudence on prosecutorial misconduct allows prosecutors wide latitude in choosing closing argument tactics. In addition, La. C.Cr.P. art. 774 confines the scope of argument to "evidence admitted, to the lack of evidence, to conclusion of fact that the state or defendant may draw therefrom, and to the law applicable to the case." The trial judge has broad discretion in controlling the scope of closing argument. State v. Prestridge, 399 So.2d 564, 580 (La.1981). Even if the prosecutor exceeds these bounds, the Court will not reverse a conviction if not "thoroughly convinced" that the argument influenced the jury and contributed to the verdict. See State v. Martin, 93-0285 (La.10/17/95), 645 So.2d 190, 200; State v. Jarman, 445 So.2d 1184, 1188 (La.1984); State v. Dupre, 408 So.2d 1229, 1234 (1982).
In this case, taken in context, the statement "there wasn't any limitations on his passing the polygraph test. He was telling the truth," related only to Runnels' participation in the crime and why he was able to plead guilty to an accessory after the fact to simple robbery. In addition, the statement "there wasn't any limitations on his passing the polygraph test" is so vague that we cannot conclude that the jury would be misled.
Further, this case is easily distinguishable from Hocum in which this Court determined that admission of testimony regarding a polygraph examination required reversal of a defendant's conviction. In Hocum, the defendant's former employer (and alleged co-conspirator) was the only witness who solidly linked Hocum to the crime for which he was tried. During the trial, testimony that the former employer's deal with the prosecution depended on his taking and passing a polygraph was improperly admitted. This Court reversed Hocum's conviction for inciting a felony after determining that there was a reasonable possibility that the improper introduction of this testimony contributed to the guilty verdict:
... the state's case against Hocum depended almost entirely on Gaulon's testimony; without it there could have been no indictment and no evidence to carry the case to the jury. Gaulon's credibility as a witness was therefore an important issue in the case, and there is more than a reasonable possibility that the jury's knowledge that Gaulon had successfully passed a polygraph test on the subject of his testimony could have affected its judgment and contributed to its verdict.
Hocum, 456 So.2d at 605.
In this case, Runnels' testimony that the defendant planned to beat the victim if he had to was not even evidence of defendant's specific intent to kill the victim. Further, Runnel's testimony that the defendant made a pantomime stabbing motion behind the victim's back was far from the only evidence of the defendant's guilt. The law is clear that specific intent to commit first-degree murder can be formed in an instant and "premeditation" is not an element of the crime. As discussed above, the other evidence of the defendant's specific intent was overwhelming. The location, placement, type, and number of wounds, without even considering Runnels' testimony, clearly establish that the defendant had, at least, the specific intent to inflict great bodily harm upon the victim. Further, the fact that the defendant *102 cut the victim's phone cord, and the defendant's statement to police that he picked up a weapon and told the victim he was going to take his CDs before stabbing him and cutting his throat, overwhelmingly establish the defendant's specific intent, regardless of Clayton Runnels' testimony. Therefore, in light of this overwhelming evidence of the defendant's specific intent, it cannot be said that the remarks about the polygraph exam might have contributed to the conviction.
Finally, the remarks, even if objectionable, do not call for a reversal of the defendant's death sentence. The remarks were all made during the guilt phase of the trial and, having found the defendant guilty of first-degree murder in light of the evidence presented at trial concerning the extremely violent stabbings the defendant committed the night of the murder, there is no reasonable possibility that the evidence complained of might have contributed to the jury's determination at the sentencing phase, and any error was harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). This assignment of error lacks merit.

CAPITAL SENTENCING REVIEW
Under La.C.Cr.P. art. 905.9 and La.S.Ct.R. 28, this Court reviews every sentence of death imposed by the courts of this state to determine if it is constitutionally excessive. In making this determination, the Court considers whether the jury imposed the sentence under the influence of passion, prejudice or other arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender. In the instant case, the trial court has submitted a Uniform Capital Sentence Report ("UCSR"), and the Department of Public Safety and Corrections ("DOC") has submitted a Capital Sentence Investigation ("CSI").
The CSI indicates that the defendant is a white male born on September 27, 1973. He was 26 years old at the time of the offense. He is unmarried, but does have one son, although he was not contributing child support at the time of the offense. The defendant was the only child born to his biological parents, but he has two half sisters born to his biological mother as a result of a previous relationship. The defendant, who was adopted at the age of 13, also has two adoptive sisters and one adoptive brother.
According to the UCSR, both of the defendant's parents were incarcerated when he was born. He was reared by his uncle, Paul Legrand, until the age of five when his mother was released from prison and regained physical custody of him. He then began living with his mother and stepfather who was his biological father's former cell-mate. During this time, the defendant claims to have been both physically and sexually abused by his stepfather. When he told his mother about the abuse, she accused him of lying and sent him to the Office of Community Service. The defendant was placed in several foster homes unsuccessfully. He was eventually placed in a group home where he claims to have been frequently molested. At the age of 13, the defendant was removed from the group home and was adopted by his uncle, Paul Legrand.
The defendant was enrolled in the Jefferson Parish Public School system and has a tenth-grade education. As for his employment history, the defendant indicated that he drifted from job to job working mainly as a laborer. The defendant worked as a Kirby vacuum salesman in 1996-1997. In 1995-1996 and 1997-1999, the defendant worked at Roto Rooter, but *103 left for other employment opportunities. The defendant has also worked as a bartender and at Office Max, for an unspecified amount of time. The CSI indicates that the defendant is classified as a first felony offender. He has a prior conviction for possession of marijuana and has been arrested for possession of drug paraphernalia, second degree battery, and carnal knowledge of a juvenile. When he was arrested in the instant case, several charges were refused by the district attorney, including theft of a firearm, possession of stolen property, possession of cocaine, possession of a firearm while in possession of a controlled dangerous substance and possession of drug paraphernalia.
A psychiatric evaluation revealed that the defendant has a prior psychiatric history. The defendant attempted suicide several times, which resulted in brief involuntary confinements at local hospitals. Although there was no indication that the defendant was under the influence of alcohol or narcotics during the commission of the instant offense, the defendant's statements allege prior drug usage. According to the UCSR, as an adolescent, the defendant was diagnosed and treated for Major Affective Disorder, Depressed type, Unipolar; Mild Learning Disability; Impulsive Character Traits; Adjustment Disorder with Mixed Disturbances of Emotion and Conduct; Intermittent Explosive Disorder, Impulsive Control Disorder; and Attention Hyperactivity Disorder. These conditions were the result of the physical and emotional abuse suffered by the defendant during his childhood.
It was determined that the defendant was able to distinguish right from wrong and was able to adhere to the right. The defendant was also able to cooperate intelligently in his own defense.

Aggravating Circumstances
At trial, the state argued that the following aggravating circumstances existed: (1) that the offender was engaged in the perpetration or attempted perpetration of an armed robbery; and (2) that the offense was committed in an especially heinous, atrocious, or cruel manner. La.C.Cr.P. art. 905.4(A)(1), (7). The jury found the existence of both of the aggravating circumstances urged by the state.
Even were we to accept the defendant's claim that the evidence failed to support that the murder was "committed in an especially heinous, atrocious, or cruel manner," the inclusion of this aggravating circumstance did not interject an arbitrary factor into these proceedings because evidence of the manner in which the offense was committed and of the nature of the victims' injuries was relevant and properly admitted at trial. See State v. Roy, 95-0638 (La.10/4/96),681 So.2d 1230, 1242, cert. denied, 520 U.S. 1188, 117 S.Ct. 1474, 137 L.Ed.2d 686 (1997). As noted above, this Court has held on numerous occasions that the failure of one or more statutory aggravating circumstance does not invalidate others, properly found, unless introduction of evidence in support of the invalid circumstance interjects an arbitrary factor into the proceedings. Bowie, supra at 395-396 (citing Wessinger, supra at 192; Letulier, supra at 799). Evidence of the invalid aggravating circumstance in this case did not interject an arbitrary factor into the proceedings because evidence of the crime, including the defendant's conduct, the victim's injuries, and the circumstances leading up to and following the murder was relevant and properly admitted at trial. Further, the remaining aggravating circumstance was amply supported. Hence, no arbitrary factors were interjected into the proceedings. See State v. Roy, supra at 1242.

*104 Proportionality

Although the federal Constitution does not require a proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Burrell, 561 So.2d 692, 710 (La.1990). This Court, however, has vacated only one capital sentence on the ground that it was disproportionate to the offense and the circumstances of the offender, State v. Sonnier, 380 So.2d 1, 7 (La.1979), although it effectively decapitalized another death penalty reversed on other grounds. See State v. Weiland, 505 So.2d 702 (La.1987) (on remand, the state reduced the charge to second-degree murder and the jury returned a verdict of manslaughter).
This Court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises. Sonnier, supra.
The state's Capital Sentence Review Memorandum reveals that since 1976 jurors in the 24th Judicial District Court have returned a guilty verdict in 56 capital cases, including this one, and recommended the death penalty 23 times before this. The first case in which the jury recommended the death penalty is that of Benjamin Berry, who fatally shot a law enforcement officer during a bank robbery. Berry was executed in 1987. State v. Berry, 391 So.2d 406 (La.1980), cert. denied, 451 U.S. 1010, 101 S.Ct. 2347, 68 L.Ed.2d 863 (1981). The second case is that of Reginald Smith, who shot the victim in a lounge parking lot. The victim's two friends ran away from the direction of the gunfire. The defendant was found guilty of first degree murder because a witness saw the defendant fire two additional shots in the direction of the parking lot, and the jury found the aggravating circumstance of knowingly created a risk of death or great bodily harm to more than one person. Smith died of natural causes in January, 1983. State v. Smith, 391 So.2d 1182 (La.1980). The third case is that of Robert Sawyer, who killed the female victim by beating her and inflicting karate kicks. She was also scalded and set on fire, after twice being raped by codefendant, Charles Lane. In March 1993, Sawyer was executed by lethal injection. State v. Sawyer, 422 So.2d 95 (La.1982), cert. denied, 466 U.S. 931, 104 S.Ct. 1719, 80 L.Ed.2d 191 (1984). The fourth case is that of Tyronne Lindsey, who killed a shopper in the Oakwood Mall parking lot. After numerous resentencings and a retrial, Lindsey was once again sentenced to death. State v. Lindsey, 543 So.2d 886 (La.1989), cert. denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990). The fifth case is that of Jimmy Robinson who killed the husband of an apartment complex manager in her presence during an armed robbery. This Court affirmed the conviction but vacated the death sentence and, on remand, Robinson received a sentence of life imprisonment without benefit of parole, probation, or suspension of sentence. State v. Robinson, 421 So.2d 229 (La.1982). The sixth case is that of Johnny Taylor who stabbed the victim multiple times and stole his car. Taylor was executed on February 29, 1984. State v. Taylor, 422 So.2d 109 (La.1982), cert. denied, 460 U.S. 1103, 103 S.Ct. 1803, 76 L.Ed.2d 367 (1983). The seventh case is that of Lane Nelson, who robbed and stabbed a transvestite who had picked him up hitchhiking to New Orleans. Before his death sentence was carried out, Nelson's *105 conviction was reversed and on retrial, he was convicted of second degree murder and sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence. State v. Nelson, 459 So.2d 510 (La.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 322 (1985). The eighth case is that of Leslie Lowenfield who shot and killed his ex-girlfriend, her daughter, her parents and her current boyfriend. This Court affirmed the conviction and sentence. State v. Lowenfield, 495 So.2d 1245 (La.1985), cert. denied, 476 U.S. 1153, 106 S.Ct. 2259, 90 L.Ed.2d 704 (1986). The ninth case is that of Glen Keith Weiland who stabbed his girlfriend and her ex-husband, killing the female victim. This Court reversed Weiland's first-degree murder conviction. State v. Weiland, 505 So.2d 702 (La.1987). On retrial the state amended the indictment to second degree murder. The jury subsequently convicted defendant of manslaughter and he was sentenced to 21 years imprisonment at hard labor. The tenth case is that of Robert Tassin, who shot two victims, one fatally, in the course of an armed robbery/drug deal. The Court affirmed his conviction and sentence. State v. Tassin, supra. The eleventh case is that of Glen Seals, who killed a cab driver in the course of an armed robbery. This Court affirmed his conviction and death sentence. State v. Seals, 95-0305 (La.11/25/96), 684 So.2d 368, cert. denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997). However, in postconviction proceeding, this court reversed his conviction and sentence on grounds that the trial court failed to make a formal determination of the defendant's competency to proceed after signing a motion appointing a psychiatrist to examine the defendant. State ex rel. Seals v. State, 00-2738 (La.10/25/02) 831 So.2d 828. The twelfth case is that of Manuel Ortiz, a murder-for-hire case in which the defendant employed a "hitman" to kill his wife and her friend. This Court affirmed the defendant's conviction and sentence. State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998). The thirteenth case is that of Julius Lucky who shot two of his co-workers, one fatally, during the course of an armed robbery. This Court affirmed his conviction and death sentence. State v. Lucky, 96-1687 (La.4/13/99), 755 So.2d 845, cert. denied 529 U.S. 1023, 120 S.Ct. 1429, 146 L.Ed.2d 319 (2000). The fourteenth case is that of Edward Harris, who shot and killed two pedestrians in a drive-by shooting. This Court reversed and remanded this case to the trial court because a potential juror was excluded from the jury based on his race. State v. Harris, 01-0408 (La.6/21/02), 820 So.2d 471. The fifteenth case is that of Teddy Chester, who killed a cab driver during the course of an armed robbery. This Court affirmed his conviction and death sentence. State v. Chester, 97-2790 (La.12/1/98), 724 So.2d 1276. The sixteenth case is that of Allen Snyder, who stabbed his wife and her new boyfriend, killing the boyfriend. This Court conditionally affirmed his conviction and death sentence, but remanded the case to the trial court for a retrospective determination of his competence to stand trial. If a retrospective determination cannot be made, or if it is determined that defendant was not competent at the time of trial, defendant shall be entitled to a new trial. State v. Snyder, 98-1078 (La.4/14/99), 750 So.2d 832. Snyder's appeal has been refiled in this Court and remains pending. The seventeenth case is that of Emmett Taylor, who killed a 69 year old employee of Rhodes Drug Store, during an armed robbery attempt. This Court affirmed the conviction and death sentence in State v. Taylor, 99-1311 (La.1/17/01), 781 So.2d 1205, cert. denied, 534 U.S. 844, 122 S.Ct. *106 106, 151 L.Ed.2d 64 (2001). The eighteenth case is that of Damon Thibodeaux, who killed 14-year-old Crystal Champagne on the levee during an aggravated rape. This Court affirmed his conviction and death sentence in State v. Thibodeaux, 98-1673 (La.9/8/99), 750 So.2d 916, cert. denied, 529 U.S. 1112, 120 S.Ct. 1969, 146 L.Ed.2d 800 (2000). The nineteenth case is that of Elzie Ball, who killed a Budweiser deliveryman during the course of an armed robbery. On May 23, 1997, Ball was convicted of first-degree murder and sentenced to death. This Court affirmed his conviction and death sentence. State v. Ball, 00-2277 (La 1/25/02), 824 So.2d 1089, cert. denied, 537 U.S. 864, 123 S.Ct. 260, 154 L.Ed.2d 107 (2002). The twentieth and twenty-first cases are those of Lawrence Jacobs and Roy Bridgewater, who committed a double murder of an adult male victim and his mother during the course of an aggravated burglary. The defendants were tried separately, convicted and each sentenced to death. This Court reversed Jacobs's conviction and death sentence on grounds of the trial court's erroneous denial of defense cause challenge and remanded for a new trial. State v. Jacobs, 99-1659 (La.6/29/01), 789 So.2d 1280. In a separate appeal, this Court found the evidence insufficient to support a first-degree murder conviction. This Court reduced Roy Bridgewater's conviction to guilty of second-degree murder, reversed the death sentence, and sentenced him to life in prison without benefit of parole, probation, or suspension of sentence. State v. Bridgewater, 00-1529 (La.11/28/01). On rehearing, this Court held that evidence was sufficient to sustain first-degree murder conviction and that the death penalty was not disproportionate. The Court therefore reinstated the defendant's conviction and death sentence. State v. Bridgewater, 00-1529 (La.1/15/02), 823 So.2d 877, cert. denied, 537 U.S. 1227, 123 S.Ct. 1226, 154 L.Ed.2d 1089 (2003). The twenty-second case is that of Jarrell Neal, who killed two people during a drug-related burglary. This Court affirmed his conviction and death sentence in State v. Neal, 00-0674 (La.6/29/01), 796 So.2d 649, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002). The twenty-third case is that of Ryan Matthews, who shot and killed the owner of a convenience store and fired another shot at a customer but missed. Matthew's appeal was filed in this Court, but the case has been remanded to the district court for further evidentiary proceedings. The twenty-fourth case is that of Thoa Tan Lam, who entered the home of a former employer and shot four people, two of whom died, and then shot himself in an unsuccessful suicide attempt. Lam's appeal was filed in this Court but the case has been remanded for purposes of conducting an evidentiary hearing on the defendant's claim that the inadequacy of his interpreter denied him due process. The instant first-degree murder comprises the twenty-fifth case in which a Jefferson Parish jury has returned the death sentence. Michael Legrand stabbed the victim to death with several weapons including kitchen knives, scissors and screwdrivers, during the course of an armed robbery. On September 28, 2000, Legrand was convicted of first degree murder and sentenced to death. State v. Legrand, 02-KA-1462.
The brief outline of the cases above indicates that the death penalty imposed in this case is not disproportionate. Further, the use of a statewide basis of comparison yields the same result. Cases are legion in which this Court has affirmed capital sentences based primarily on the jury's finding that the defendant killed the victim in the course of an armed robbery or attempted armed robbery. See, e.g., State *107 v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364 (affirming death penalty for singleshot armed robbery-murder when jury also found other aggravating circumstance that defendant had caused risk of great bodily harm to another victim), cert. denied, 519 U.S. 860, 117 S.Ct. 162, 136 L.Ed.2d 106 (1996); State v. Thompson, 516 So.2d 349, 356-57 (La.1987) (affirming death penalty for single-shot armed robbery-murder while questioning finding of other aggravating factor), cert. denied, 488 U.S. 871, 109 S.Ct. 187, 102 L.Ed.2d 149 (1988).
A comparison of the defendant's case with the above-referenced cases, indicates that the death penalty as applied to this defendant is not disproportionate considering the offender and the offense.

DECREE
For the reasons assigned herein, the defendant's conviction for first-degree murder and his sentence of death are affirmed. In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme court timely, under its prevailing rules for rehearing of denial of certiorari, or (b) that Court denies his petition for rehearing, the trial judge shall, upon receiving notice from this Court under La. C.Cr.P. art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by La. R.S. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the defendant in any state postconviction proceedings, if appropriate, pursuant to its authority under La. R.S. 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed, in the state courts.
AFFIRMED.

ON APPLICATION FOR REHEARING
PER CURIAM.
Granted for limited purpose of addressing defendant's motion to remand this case, which was filed on November 20, 2002, and which this Court referred to the merits of the appeal by order issued on December 18, 2002. Otherwise, the application for rehearing is denied.
On March 3, 2003, defendant filed its brief on appeal asserting 51 assignments of error. In footnote 98, included in the section addressing assignment of error no. 32 ("the death sentence is disproportionate under the facts of this case"), defendant referred to the motion to remand, as follows:
This Court has referred to the merits of this appeal Mr. Legrand's Motion to Remand for Adjudication of his Motion for New Trial Under the Proper Standard of Review. In the motion, which is incorporated by reference herein, he argues that the trial court failed to apply the proper standard of review to address Mr. Legrand's arguments that his death sentence was against the weight of the evidence or that, under La. C.Crim. P. Art. 851(5), the ends of justice would be served by granting a new sentencing hearing. In the event that this Court does not reverse on other grounds, Mr. Legrand respectfully urges that the case must be remanded to allow the trial court to analyze his motion for new trial under the proper standard of review.
This Court failed to address the motion to remand in the main opinion or the appendix to the main opinion and we therefore *108 granted the application for rehearing for the limited purpose of ruling on the motion to remand.
In the motion to remand, defendant argues that the trial court erroneously denied his motion for new trial, because in denying the motion for new trial, the trial judge wrongly believed that "I have a non-discretionary decision anyway," when in fact, the judge has discretion to grant a new trial when he is of the opinion that the ends of justice would be served by the granting of a new trial. La. C.Crim. P. Art. 851(5).
Having reviewed the transcript of the hearing and ruling on the motion for new trial, it is clear that the trial judge applied the correct standard of review in denying the motion for new trial. After hearing argument from counsel addressing the motion for new trial, the trial judge stated that he had thought about the case thoroughly and determined that the jury had an abundance of evidence to find defendant guilty of first degree murder and then went through all the arguments individually and found them meritless. He then stated "I am going to deny the motion for new trial." Although defendant argues that the trial court has the discretion to order a new trial on sentencing under La.C.Cr.P. art. 851(5), there is no indication in this record that the trial judge felt that a new trial was warranted and accordingly, he denied the motion.
The court then proceeded to sentencing. The trial judge asked if defendant wished to say anything before sentencing and defense counsel referred the trial judge to a letter defendant had written him which had been placed under seal. The trial judge stated that he had not read the letter and defense counsel asked that it be unsealed when it became part of the record. The trial judge then stated,
"Okay. It can be unsealed for whatever purposes. I mean I'll read it later, but it's not supposed to influence my decision.
[Defense counsel]: Correct.
Trial judge: And I have a non-discretionary decision anyway.
Thus, although defendant asserts in his rehearing application that "the trial court denied the motion [for new trial] under the mistaken belief that it had a `non-discretionary decision,'" it is clear that the trial court was not referring to his discretion in ruling on the motion for new trial, but rather, having already denied defendant's motion for new trial, was merely commenting on his discretion in sentencing the defendant in accordance with the jury's determination pursuant to La.C.Cr.P. art. 905.8.
Accordingly, defendant's motion to remand is denied.
NOTES
[1] Runnels later entered a guilty plea to accessory to simple robbery for his role in the incident.
[2] The assignments of error not discussed in this opinion do not constitute reversible error and are governed by well-settled principles of law. Those assignments are reviewed in an unpublished appendix that will comprise a part of the official record in this case.
[3] The defendant was able to drive to the victim's house, tell the victim that he was about to take his CDs and stab the victim a number of times. He even had the presence of mind to cut the victim's telephone cord, so that he would be unable to call for help. Following the stabbing, the defendant packed the victim's CD collection and passed it over the fence to his accomplice. He then removed money from the victim's wallet and attempted to clean the blood off himself. After changing into some of the victim's clean clothes, the defendant returned to his vehicle and drove away from the apartment.
[4] In State v. Moore, 414 So.2d 340, 348 (La. 1982), cert. denied, 463 U.S. 1214, 103 S.Ct. 3553, 77 L.Ed.2d 1399 (1983), the victim received 13 stab wounds and died "with awareness of her impending death." In State v. Taylor, 422 So.2d 109 (La.1982), cert. denied, 460 U.S. 1103, 103 S.Ct. 1803, 76 L.Ed.2d 367 (1983), there was evidence that the more than 20 stab wounds did not cause immediate death. The coroner testified that death would have taken place over a period of minutes (10 to 20) as the lungs collapsed and blood slowly leaked from the blood vessels. This Court did not reach a definite conclusion on the heinous nature of the crime in State v. Kirkpatrick, 443 So.2d 546 (La.1983), cert. denied, 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 847 (1984), but indicated that the crime had been committed in an especially heinous, atrocious or cruel manner. The victim, who had received two stab wounds with a butcher knife, had been "left bleeding on the floor before he was, out of cruelty or pity, shot in the head." Kirkpatrick, 443 So.2d at 560. That victim had also received two blows to the head with a heavy glass object.
[5] In Womack, a witness testified that his reason for coming to Louisiana was "to administer polygraph examinations." Womack, 592 So.2d at 880. The witness's testimony also "showed that defendant was willing to take the test but that no test was administered due to defendant's confession ... [and] no test results were offered." Id. The court found that "[t]his brief, unsolicited reference to `polygraph' was not an impermissible or erroneous reference to test results." Id.
[6] The polygraph tests and results, which were not seen by the jury, actually contained only the following:

"Were you present when Rafael was stabbed?" "No."
"Were you present when Rafael was stabbed last month?" "No."
"Were you at Michael Legrand's apartment when Rafael was stabbed last month?" "No."
[7] It should also be noted that defense counsel requested the admonition only after attempting to delve deeper into the details of the polygraph examination during the cross-examination.
[8] In fact, in its closing argument, the defense attorney stated "... I never suggested to Clayton Runnels that he was there, okay, on the night of the murder."